Ignatius G. ANG, Plaintiff–Appellant,

v.

The PROCTER & GAMBLE COMPANY, Defendant–Appellee.

No. 90–3925.

United States Court of Appeals, Sixth Circuit.

Argued March 26, 1991.

Decided May 8, 1991.

Paul H. Tobias (argued), Tobias & Kraus, Ellen L. Nagel, Cincinnati, Ohio, for plaintiff-appellant.

Kathleen K. Bedree, Harold Freeman (argued), Dinsmore & Shohl, Cincinnati, Ohio, for defendant-appellee.

Before KENNEDY and RYAN, Circuit Judges, and FEIKENS, District Judge.*

RYAN, Circuit Judge.

Ignatius Ang appeals the dismissal of his complaint alleging race discrimination in violation of 42 U.S.C. § 1981; national origin discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2; and retaliatory dismissal in violation of 42 U.S.C. § 2000e–3. The following issues are before the court on appeal:

1. Whether the district court erred in dismissing Ang's race discrimination claim brought under 42 U.S.C. § 1981;

2. Whether the district court erred in dismissing Ang's retaliatory discharge claim brought under 42 U.S.C. § 2000e–3;

---

* The Honorable John Feikens, Senior District Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.

3. Whether the district court erred in refusing to hear Ang's claim of race discrimination under Title VII;

4. Whether the district court erred in not allowing testimony regarding disparate treatment; and

5. Whether the district court erred in granting Procter & Gamble's motion for involuntary dismissal?

We believe the district court correctly determined these matters and we shall, therefore, affirm.

## I.

Ignatius Ang, Ph.D., is a United States citizen born in Indonesia of Chinese ancestry. He was employed by Procter & Gamble from 1973 until September 15, 1987. During his tenure with P & G, Ang worked for P & G's German subsidiary (1973–75), its Cincinnati headquarters' Management Systems Division (MSD) (1975–80), its Modesta, California manufacturing plant (1980–83), and Cincinnati's Integrated Packaging System (IPS), a part of MSD (1984–87).

During his assignment to IPS, Ang worked under technical director Ron Yates and was directly supervised by Mike Menner. In May 1984, Menner submitted the following evaluation of Ang:

[Ang] continues to demonstrate a need for improved communication skills, both verbal and written forms. Additionally, he has had some difficulty in utilizing appropriate influence styles, probably stemming from a lack of self-confidence and the existing cultural differences.

[Ang] has a very real tendency to underestimate his strengths, as well as a demonstrated inability to recognize his limitations and to proactively identify means for improving those limitations. The basis for this difficulty is obviously rooted in a real lack of self-confidence in his own skills and inabilities. This lack of self-confidence has also impacted his ability to effectively influence others.

Primarily due to the difference in cultures, some characteristics that have become expected for others in MSD may never be evident in [Ang]. For example;

MSD generally considers assertiveness in an individual to be one of the key success ingredients, yet, because of his cultural norms, [Ang] may never possess this characteristic. Those who manage [him] must be capable of recognizing these cultural differences, help him to accept and adjust where possible, and when change is not possible, then the manager must develop more reasonable expectations.

After reviewing the evaluation, Ang wrote that it was "an accurate reflection of my current job performance.... I am very thankful for the good & open relationship with my boss (Menner) who I admire & respect very much for his understanding, guidance, fairness, positive criticism and openness."

In 1985, Ang was rated as among the lowest 15% of MSD employees. Ang complained to Yates that his work evaluations were inaccurate and his ranking undeserved. Ang demanded an apology from his Modesta, California manager for the low ranking given him there; promotion from a level three senior systems analyst to level four; an immediate pay increase of twenty to thirty per cent; and installation as an IPS project manager. After meeting on February 8 with Frank Caccamo, his second line supervisor, Ang withdrew his requests for a pay increase and promotion.

Two weeks later on February 22, Ang met with Caccamo, Menner, and others to discuss his role in IPS and his MSD ratings and rankings. Ang's supervisors indicated that his low rankings were partly attributable to his difficulty understanding oral communication. As a result of this meeting, Ang was offered and accepted a future role in the IPS project. The agreement was jeopardized, however, when, on March 11, after viewing a videotape of a speech by Yates in which Yates failed to name Ang as a member of IPS' technical team, Ang vowed never to work for Yates. Menner suggested that Yates failed to mention Ang, and another future member of the IPS team, because their roles in IPS were undetermined at the time of the speech. Ang immediately agreed to drop the matter but told Menner the next day that Yates'

omission constituted another example of discrimination against him.

On March 13, Caccamo and Robert Dixon, who replaced Menner as Ang's supervisor, told Ang that he had three options: work with Yates on IPS; work with Dixon to find an appropriate role outside of IPS; or work with an outplacement counselor to obtain work outside of P & G. After consulting with an outplacement counseling firm, Ang informed P & G that he would remain with IPS. P & G named him leader of IPS Visual Output on the understanding that the issues raised in the previous two months were considered resolved and would not be reopened.

From May 1985 to early 1987, no further problems arose. In 1986 Yates wrote the following evaluation:

Due to [Ang's] cultural background [his] style of exerting leadership is to work quietly behind the scenes, which can be particularly effective with strong-willed individuals. However, this leadership style may take more time, may not be successful and is not viewed as positive in the MSD culture as a more proactive influence style. [Ang] must take more risk and exert influence in a more direct fashion, risking conflict and in the process learning how to manage conflict better. I know this is difficult for him, but is a skill he will gain comfort with from practice.

The evaluation also noted that Ang's performance had improved steadily over the past twelve months and that he "has demonstrated increased self confidence, increased productivity, a very positive attitude and increased organizational awareness." His January 1987 evaluation also commented on improved performance and extraordinary technical talent.

In 1987, Ang began complaining that he had not received sufficient credit for his early IPS work.

Ang began to send messages through the Deming Conference, a computer-networked, electronic mail service for employees to share successful applications of techniques learned during P & G training seminars conducted by Professor Edwards W. Deming. After Ang sent his first message in June 1987, another employee complained to Earl Conway, who had organized the Conference, that Ang's message was long and irrelevant. Conway sent a message to the Conference restating its objectives. When Ang sent another long message to the Conference, Conway met with him to remind him of the Conference's purpose and the need for concise messages. Ang's messages stated that Professor Deming rejected all rankings and ratings. Conway tried to clarify that Deming criticized only infrequent or incorrect evaluations, but Ang continued to send frequent, long messages restating his position on ratings and rankings. Conway informed Ang in June 1987 that Conference participants were complaining about his messages and offered to assist him in writing future messages. Despite the offer of assistance, Ang entered thirty-three messages into the Deming conference during July 1987, one quarter of all the messages sent that month. Conway noted that Ang seemed to spend inordinate time on the Conference which was intended for use as an "extracurricular" activity, not a regular work assignment.

On July 17, 1987, Ang divulged information on the Deming Conference concerning his IPS project responsibilities at a time when non-P & G employees may have had access to the Conference. Because P & G considered this information confidential and competitively sensitive, Yates asked Ang not to share such information with the Conference again. Ang immediately sent a message stating that his boss had prohibited him from discussing IPS and that he believed Yates was wrong to do so.

On July 22, 1987, Ang informed Yates that he would not do "3-D" work which he had originally agreed to perform. Yates asked Ang to cancel 3-D training at Stanford University which was no longer necessary. Ang originally agreed to cancel the training but later had second thoughts. He told Yates to cancel the training if he was so anxious for the cancellation. Ang cancelled the training a week after Yates' request.

During his weekly meetings with Yates during the summer of 1987, Ang twice swore and shouted so loudly that Yates was required to shut his office door. Upon review of Ang's meeting agenda on August 5, Yates became convinced that Ang was not devoting sufficient time to current assignments. Seven of Ang's ten agenda items dealt with personal issues and the other three with completed ministerial tasks.

On August 6, Ang confronted Yates and demanded an explanation of his exclusion from the Ph.D team, which consisted of Ph.Ds and non-Ph.Ds who review the credentials of P & G's Ph.D recruits.

At his weekly meeting on August 12, Yates informed Ang that he would be terminated if his time-consuming and unprofessional conduct continued. Ang spent several hours the next day composing an electronic mail memorandum summarizing his problems with Yates. Yates and his supervisor, Richard Kiley, spent work time reviewing and correcting what they believed were the many factual errors contained in the memo.

Ang continued to pursue his protest regarding his exclusion from the Ph.D team. Mike Dougherty, a team member, informed Ang that he had not been deliberately excluded but that the team included non-Ph.Ds and not every Ph.D had been invited to join. On August 18, 1987, Ang contacted Ph.D team organizer Jim Scott to protest his deliberate exclusion from the team. Scott explained that no intentional exclusion had occurred. Ang observed that no minorities were on the Ph.D team and demanded that a study of the progression of minority Ph.Ds in the MSD Department be conducted.

On August 19, 1987, Kiley, Yates and Bill Ford, a senior employee relations manager, agreed that Ang would be terminated. Ang was terminated on September 15 when he returned from vacation.

Ang filed suit in the district court, and, in an amended complaint, alleged race discrimination in violation of 42 U.S.C. § 1981; national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e–2; and retaliatory discharge in violation of Title VII, 42 U.S.C. § 2000e–3. The district court dismissed the retaliation and section 1981 claims, referring the Title VII action to a magistrate. After hearing the evidence, the magistrate recommended that the district court grant P & G's motion for an involuntary dismissal pursuant to Fed.R. Civ.P. 41(b). The district court adopted the magistrate's Report, Findings of Fact, Conclusions of Law and Recommended Decision and granted P & G's motion for involuntary dismissal.

## II.

### A. Dismissal of Section 1981 Claim

The Magistrate granted P & G's 12(b)(1) motion to dismiss Ang's section 1981 claim because section 1981 only proscribes discrimination in the making and enforcement of contracts. We review this dismissal *de novo*. *Moir v. Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir.1990). In reviewing the dismissal, all allegations in the complaint must be taken as true and construed in a light most favorable to the nonmovant. *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). A motion to dismiss may only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that an employee could not sue for racial harass-

ment under section 1981 "because that provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.*, 109 S.Ct. at 2369. Although *Patterson* was not a discriminatory discharge case, the Sixth Circuit has held it applicable to cases of discriminatory discharge:

> *Patterson* did not address the issue of discharge directly, but it did explicitly limit the application of section 1981 to discrimination in the formation or enforcement of contracts. Discharge from employment involves neither of these elements.... To limit *Patterson* to cases involving discrimination in ongoing employment is to ignore the language and reasoning of the Supreme Court. *Patterson* explicitly stated that section 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.* at 2369. In refusing to extend section 1981 to harassment cases, the Court reasoned that Title VII's procedures would be of little effect if they could be circumvented by suits under section 1981.

*Prather v. Dayton Power & Light Co.*, 918 F.2d 1255, 1257 (6th Cir.1990). Ang argues that his case is distinguishable because most discriminatory discharge cases applying *Patterson* involve employment at will, whereas he was protected by an employment contract. Prather, however, also had an employment contract. *Id.* at 1258.

### B. Dismissal of Race Discrimination Claim

■ In his charge filed with the EEOC, which was subsequently referred to the Ohio Civil Rights Commission (OCRC), Ang complained that "I was terminated from my position as a Senior Systems Analyst on Sept. 15, 1987 due to my national origin, Indonesian.... I believe that I was fired because of my national origin (Indonesian) since retained employees have done the same things as me without being fired." In the boxes for marking the type of discrimination charged, Ang marked only "na-

tional origin," although "race" and "retaliation" were also listed on the form. Based on Ang's charge and the OCRC's determination letter which indicated that they had only investigated national origin discrimination, the district court found that Ang's failure to pursue an administrative solution before the OCRC precluded him from litigating a race discrimination claim in federal court. We review a district court's factual findings in a dismissal for lack of subject matter jurisdiction only for clear error. *Lowe v. City of Monrovia*, 775 F.2d 998, 1003 (9th Cir.1985), *amended*, 784 F.2d 1407 (9th Cir.1986).

In order for federal courts to have subject matter jurisdiction of Title VII claims, the claimant must first unsuccessfully pursue administrative relief. *Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Courts have thus held that if the claimant did not first present a claim to the Equal Employment Opportunity Commission (EEOC), that claim may not be brought before the court. *Lowe*, 775 F.2d at 998; *Jackson v. Ohio Bell Telephone Co.*, 555 F.Supp. 80 (S.D.Ohio 1982). The judicial complaint must be limited "to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 446 (6th Cir.1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978). Thus, in *Lowe*, a failure to bring a sex discrimination charge in an EEOC complaint of race discrimination precluded bringing that charge before the court. *Lowe*, 775 F.2d at 1003–04. Because Lowe, like Ang, was a member of two minority groups, it may not have been possible for her, a black woman seeking a position on an all white, all male police force, to determine whether the discrimination she suffered was on account of race or sex. The clear language of her EEOC complaint, "I feel the sole reason for my denial of the job is because I am Black," convinced the court, however, that she had not stated a claim for sex discrimination before the EEOC. *Id.* at 1004. Although not as definitively and exclusively, Ang also clear-

ly alleged only national origin discrimination.

The scope of Ang's complaint does not automatically expand due to his membership in more than one minority group. In *Castro v. United States*, 775 F.2d 399, 403 n. 2 (1st Cir.1985), the court commented that the argument that the "EEO Office should have known that Diaz Diaz was alleging discrimination on the basis of national origin by the fact that he is Puerto Rican and by the fact that he alleged discrimination on the basis of age is contrary to both logic and law." This refusal to broaden the Title VII claim has been applied to allegations virtually identical to those brought here. In *Shah v. Mt. Zion Hosp. & Medical Center*, 642 F.2d 268, 271–72 (9th Cir.1981), the court held that an East Indian male who, like Ang, alleged national origin discrimination in his EEOC claim could not include charges of race, color, and religious discrimination in his Title VII complaint. This refusal to treat race and national origin claims identically is supported by the Supreme Court's definition of national origin as "the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). Noting this definition, the court in *Roach v. Dresser Indus. Valve & Instrument Div.*, 494 F.Supp. 215, 216 (W.D.La.1980), stated that "[t]he legislative history enunciates precisely that a person's national origin has nothing to do with color, religion, or race." Ang's charge of national origin discrimination does not necessarily include charges of race discrimination, and the OCRC's determination letter indicates that they did not construe the national origin charge to include race discrimination.

Because Title VII is a remedial statute, many courts refuse to narrowly construe the charge where such a construction would preclude a plaintiff from bringing a claim. *See Obradovich v. Federal Reserve Bank of New York*, 569 F.Supp. 785 (S.D. N.Y.1983); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir.1970); *Scott v. Overland Park*, 595 F.Supp. 520 (D.Kan 1984). Courts require this broad reading

of the charge because most Title VII claimants are unschooled in the technicalities of the law and proceed without counsel. *See Sanchez*, 431 F.2d at 463; *Scott*, 595 F.Supp. at 526; *Obradovich*, 569 F.Supp. at 789. Ang, however, was assisted by counsel throughout the administrative investigation. Liberal construction is not necessary where the claimant is aided by counsel in preparing his charge. *Hawley v. Dresser Indus., Inc.*, 737 F.Supp. 445, 452 n. 3 (S.D.Ohio 1990).

Because Ang's Asian race and Indonesian ancestry are closely related and may have both contributed to any discrimination he suffered, the district court could have concluded that an investigation could reasonably include discrimination based on race and national origin. The court, however, did not clearly err in concluding that Ang's failure to raise race discrimination in his EEOC charge was a fatal flaw as Ang was assisted by counsel in writing his charge, his charge did not specifically allege race discrimination, and the EEOC did not investigate race discrimination.

### C. Dismissal of Retaliation Claim

■ Ang contends that he was terminated in part as retaliation for his protests against the inferior treatment of minorities by P & G, particularly his demand that P & G conduct a study of the progress of minority Ph.Ds. The EEOC charge, however, did not refer to retaliation in the factual statement, nor did Ang check off the "retaliation" box when asked to identify the type of discrimination suffered. The district court thus granted P & G's Motion to Dismiss Ang's section 704 retaliatory dismissal charge because "the allegations of retaliatory discrimination are not within the scope of an investigation reasonably related to Plaintiff's charge of national origin discrimination." 715 F.Supp. 851.

Courts have held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly be-

fore the court." *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981); *See also Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168–69 (11th Cir. 1988). Because retaliation claims, by definition, arise after the filing of the EEOC charge, this rule promotes efficiency by requiring only one filing. *Id.* Ang's claim, that P & G fired him in retaliation for his demand that they study the differential treatment of minority Ph.Ds at P & G, involves conduct occurring prior to the filing of the EEOC charges and thus could have been alleged in the original charge. Retaliatory conduct occurring prior to the filing of the EEOC complaint is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint. *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 n. 2 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989).

### D. Disparate Treatment Claim

Ang also complains that the Magistrate did not allow him to develop a claim of disparate treatment. Ang alleges that P & G had a policy of termination only as a last resort and that other similarly situated non-minority individuals were not terminated. Ang tried to support this theory through questions to various P & G personnel administrators asking whether the witness was familiar with an employee who was terminated for particular conduct. The court sustained objections to questions asking whether other individuals were discharged for "alleged performance problems," "pursuing personal grievances," "complaining about being unhappy at work," "talking to people outside the chain of command," and for "complaining about the ranking or the way they were rated." Prior to asking these questions, counsel failed to establish that these were the alleged reasons behind the discharge. When counsel asked a question close to describing what P & G believed to be the actual reason for the discharge, "taking up personal grievances with management so that the management had to spend a great deal of time in listening to the employee's objec-

tions," P & G did not object and the court allowed the question.

The district court's relevancy rulings are reviewed only for abuse of discretion. *United States v. Gahagan*, 865 F.2d 1490 (6th Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 590 (1989). Such determinations should only be reversed under extraordinary circumstances. *United States v. Heyward*, 729 F.2d 297 (4th Cir. 1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985). Although the district court does not state its basis for sustaining P & G's objections, the questions asked by plaintiff's counsel are irrelevant as long as counsel failed to establish the assumptions upon which the questions relied, that Ang was terminated for the reasons stated in the questions. *United States v. Williams*, 704 F.2d 315, 321–22 (6th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). Ang failed to show that the Magistrate abused his discretion and thus the rulings should be affirmed.

### E. Dismissal of Title VII Claim

Following the completion of Ang's trial presentation, the court granted P & G's motion for involuntary dismissal of the Title VII claims under Fed.R.Civ.P. 41(b). The Magistrate found that Ang had failed to establish a *prima facie* case of discrimination under Title VII because he had demonstrated only that he was born in Indonesia, was of Chinese descent, and had been employed and terminated by P & G. The Magistrate found that even if Ang had stated a *prima facie* case, P & G had met its burden by demonstrating legitimate, nondiscriminatory reasons for the termination. These reasons included Ang's resurrection of his 1985 complaints despite his agreement to forego those claims, the excessive managerial time devoted to supervising him, his excessive pursuit of personal matters and the Deming Conference during the workday, and his failure to follow his supervisor's orders as evidenced by his refusal to cancel the training at Stanford University.

■ The Federal Rules of Civil Procedure provide that:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant may ... move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of the evidence.

Fed.R.Civ.P. 41(b). In carrying out his duty to weigh and evaluate the evidence, the trial judge makes no special inferences in favor of the plaintiff. *Hersch v. United States*, 719 F.2d 873, 876 (6th Cir.1983). Because a Rule 41(b) dismissal "operates as an adjudication upon the merits, it is subject to the clearly erroneous standard of review." *D.E. Rodgers Assoc., Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1434 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Thus, an appellate court may not reverse unless after a full review of the evidence, it is left with "the definite and firm conviction that a mistake has been made." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■■ In Title VII cases, the plaintiff bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case under Title VII, a plaintiff must show that he is within a protected class; subject to an adverse employment action; qualified for the job; and replaced by a person outside the protected class. *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir.1989). If the plaintiff successfully proves a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's discharge." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the

evidence "that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

### 1. *Failure to State a Prima Facie Case*

■ The Magistrate concluded that Ang failed to establish a *prima facie* case of discrimination under Title VII. The Magistrate explicitly found only that Ang was within a protected class and that he had been subject to an adverse employment action. The Magistrate made no explicit findings regarding Ang's qualification for the job and his replacement by a person outside the protected class. Ang contends that because John Dashiells, a Caucasian, replaced him, and because he performed satisfactorily for fourteen years, he was qualified and replaced by someone outside the protected group and thus had established a *prima facie* case.

■ When a court is convinced that a plaintiff completely failed to allege circumstances from which discrimination can be inferred, the court need not examine all elements of the *McDonnell Douglas* analysis. *Centner v. K–Mart Corp.*, 50 FEP Cas. (BNA) 1774, 1775, 1988 WL 73904 (W.D.N.Y.1988). However, even if the Magistrate was bound to consider the issue of qualification, Ang was not qualified for his position because he failed to meet his employer's expectations. As the Sixth Circuit recently explained in *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990):

[I]n order to show that he was qualified, McDonald must prove that he was performing his job "at a level which met his employer's legitimate expectations." *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir.1983). Moreover, "[i]f [McDonald] was not doing what his employer wanted him to do, he was not doing his job.... [McDonald] does not raise a material issue of fact on the question of the quality of his work merely by challeng-

ing the judgment of his supervisors." *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). In this case, McDonald does not dispute, but in fact acknowledges that his supervisors were dissatisfied with his job performance in the summer of 1986 when he was discharged. Instead McDonald argues that Union Camp made too big a deal out of his alleged "people problems." However, the aim is not to review bad business decisions, or question the soundness of an employer's judgment. *See Wilkens [Wilkins] v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir.1986). McDonald was simply not performing to Union Camp's satisfaction.

Like McDonald, Ang was not performing to his employer's satisfaction. Ang devoted a good deal of time to personal grievances and the Deming Conference and his supervisors feared that this interfered with his job responsibilities. Handling Ang's concerns also took a great deal of time away from his supervisors' other responsibilities. Evaluations of Ang also indicate that he had trouble communicating, was late with assignments, used insufficient detail in writing plans, and was a poor long-range planner. Ang, then, was not qualified and thus did not establish a *prima facie* case.

 Ang argues, however, that it was not necessary for him to establish a *prima facie* case because he offered direct evidence of national origin discrimination. Direct evidence of discrimination allows a plaintiff to proceed without meeting the requirements of a *prima facie* case set forth in *McDonnell Douglas. Trans World Airlines v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). However, even if Ang is able to bypass the *McDonnell Douglas* requirements, he still would not succeed because the burden would simply shift back to P & G to show that Ang was terminated for legitimate nondiscriminatory reasons. Because Ang refused to follow supervisors' instructions, devoted inadequate time to his work, and demanded the constant attention of his supervisors to handle his grievances and personal problems, the district court did not clearly err in concluding that P & G articulated legitimate nondiscriminatory reasons for his discharge.

### 2. Linguistic Discrimination

██ Ang contends that P & G discriminated against him because of his manner of speaking, in violation of Title VII. P & G's Company Norms brochure advised minorities to "be aware that inability to speak the 'King's English' may be viewed by those in the majority culture as equating to intelligence (i.e. lack of)." Yates also testified, and Ang's evaluations indicated, that Ang's written and oral command of the English language was weak and hampered his effectiveness. Because "accent and national origin are inextricably intertwined," evaluating these claims presents a difficult task for the court. *Fragante v. City & County of Honolulu*, 888 F.2d 591 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990).

The EEOC recognizes linguistic discrimination as national origin discrimination and prohibits "the denial of equal employment opportunity ... because an individual has the ... linguistic characteristics of a national group." 29 C.F.R. § 1606. The Sixth Circuit has also recognized that discrimination based on manner of speaking can be national origin discrimination. In *Berke v. Ohio Dep't of Pub. Welfare*, 628 F.2d 980, 981 (6th Cir.1980), the court affirmed a judgment for the plaintiff by observing that the evidence supported the district court's finding that "plaintiff was denied two positions within the Department because of her accent which flowed from her national origin." Unlawful discrimination does not occur, however, when a plaintiff's accent affects his ability to perform the job effectively. *Fragante*, 888 F.2d at 597.

P & G did not indicate that Ang was terminated because of language problems. The evidence cited by Ang comes mostly from the testimony of Yates in which he responded to questions from Ang's counsel specifically addressing Ang's communication abilities. Ang's evaluations mention

communication problems, but they also note other weaknesses. Because Ang presented no evidence that he was terminated because of his accent, the lower court did not clearly err in refusing to find that Ang showed direct evidence of linguistic discrimination.

### 3. *Disparate Treatment*

Ang argues that he presented unrefuted evidence of disparate treatment: his exclusion from the Ph.D team and the lack of minorities on the team in general, his status as the only IPS manager with no one working under him, his exclusion from IPS meetings, P & G's harassment over his participation in the Deming Conference, and his termination without exploring other alternatives. P & G argues that Ang mischaracterizes all of these incidents. First, Yates and Kiley testified that they were not aware that the Ph.D team existed and Yates further testified that if he had known of the team, he would have recommended Ang for it. Second, P & G explains that Visual Output was structured with no subordinate employees and that Ang accepted the job knowing that it would not involve supervision. Third, the only IPS meeting Ang was excluded from was the kickoff meeting and he was explicitly told by P & G that he was not included because his role in IPS had not yet been defined. Fourth, no other employee dominated the Deming Conference as Ang did and thus Ang was not treated disparately when his supervisors discussed with him his zealous participation, their concerns that his participation might affect his attention to his primary responsibilities and his divulging confidential information to the Conference. Finally, Ang was terminated after many warnings and discussions and was not treated disparately because no other employee had created the problems which he had. When two versions of the facts are offered, a court cannot clearly err in choosing between them. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

### 4. *Pretext for Discrimination*

■ Ang argues that the reason offered by P & G for his termination, his

disruptive behavior, was a pretext. He contends that his work was good and that P & G fired him because he protested discrimination. Ang disagrees with the Magistrate's failure to explicitly consider the issue of pretext.

Although Ang points to quotes from evaluations describing his technical skill and ability to work as a team player, those same evaluations also discuss his inattention to detail, inability to plan, and lack of assertiveness. His supervisors, in the months immediately preceding his dismissal, spoke to him of their concerns that he was spending insufficient time on his work. Those supervisors also testified that he refused to follow directions or change his disruptive behavior after their warnings. The Magistrate did not clearly err in finding that P & G offered legitimate, nondiscriminatory reasons for the discharge.

The Magistrate, in finding P & G's reasons for the discharge credible, implicitly found that those reasons were not pretextual. He also did not clearly err in this finding. P & G offered evidence that they were not aware of Ang's request for a minority Ph.D study until after they made their decision to terminate him. When choosing between two conflicting views of the facts, the district court cannot be found to have clearly erred. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

### III.

Because the district court correctly determined the issues raised on appeal, we AFFIRM.