**Brian J. POLLARD, Plaintiff,**

v.

**CITY OF NORTHWOOD,
et al., Defendants.**

**No. 3:99CV7624.**

United States District Court,
N.D. Ohio,
Western Division.

March 19, 2001.

---

Brian J. Ballenger, Ballenger & Moore, Northwood, OH, Travis W. Brant, Joan C. Szuberla, Spengler Nathanson P.L.L., Toledo, OH, David M. Jones, Margaret Mattimoe Sturgeon, Eastman & Smith, Toledo, OH, for City of Northwood, Charles Curtis, Douglas Breno, Douglas Marshall.

Harland M. Britz, Britz and Zemmelman, Toledo, OH, Thomas A. Sobecki, Toldeo, OH, for Brian J. Pollard.

## ORDER

CARR, District Judge.

This is an employment discrimination case in which plaintiff brings sexual harassment and retaliation claims against his employer, defendant City of Northwood ("City") in violation of Title VII. 42 U.S.C. § 2000e(5)(e). Plaintiff also alleges that the City violated the Americans with Disabilities Act ("ADA") by terminating his employment based on his disability and by wrongfully disclosing confidential medical information. Jurisdiction arises under 28 U.S.C. § 1331 (1993). Pending is the City's motion for summary judgment. (Doc. 48). For the following reasons, the City's motion shall be granted in part and denied in part.

## FACTS

Plaintiff, a heterosexual male, was formerly employed as a full-time police officer with the City from May 12, 1997, to March 5, 1999. (Compl. at 2–3). Defendant Douglas Breno, chief of police for the City, recommended that plaintiff be hired for the position. (Breno Dep. at 10). Defendant Douglas Marshall, sergeant of the police force, participated in the interview process. (Id.). Defendant Charles Curtis, the City Administrator, made the final decision to hire plaintiff. (Doc. 51 at 1).

After plaintiff was hired, Marshall became one of his supervisors. (Id.). Marshall is a homosexual. (Id.). Plaintiff alleges that after he was hired, Marshall told him that he would help him move from Cincinnati, where plaintiff lived prior to being hired by the City. (Id.). Plaintiff also alleges that Marshall told him that he could live with him. (Id.).

On October of 1997, Diana Herman, a detective in the detective bureau, telephoned plaintiff. (Pollard Dep. at 20). Up to that point, according to plaintiff, he did not perceive any problems with the City, although he did feel that he hadn't been "well accepted" by the police force. (Id.). According to the plaintiff, Herman told him that she had heard rumors that plaintiff "ran too much traffic" and was not available for calls. (Id. at Ex. C). Plaintiff alleges that Herman told him:

She said that Sergeant Marshall was making comments to the effect that I'm his buddy on the department .... and that other officers did not like Sergeant Marshall.... [S]ince Wayne Phillips told me in the beginning of my field training that Sergeant Marshall was homosexual and Diana Herman telling me comments that he made prior to my

hiring, it started to make a little bit of sense what she was saying. She said that the guys on the department did not like Doug Marshall because of his homosexuality and by him making comments or beginning rumors, the guys had a bad perception of me before they even met me.

(Pollard Dep. at 28–30).

Plaintiff also testified that, at the time Herman telephoned him, Marshall had said nothing to lead him to believe that Marshall wanted to be plaintiff's homosexual friend or lover. (*Id.* at 37).

At her deposition, Herman testified that she told plaintiff that he was being treated poorly by his co-workers. (Herman Dep. at 29). Herman stated that she felt plaintiff was being treated differently because the other officers believed him to be "arrogant and obnoxious. Thought he was a know it all. Couldn't accept any type of criticism. Very unfriendly himself." (*Id.*). Herman did not tell plaintiff that the other workers believed he was gay. (*Id.*). Furthermore, Herman denied telling plaintiff anything concerning the other officers' alleged belief that Marshall was hoping plaintiff would be his homosexual lover and that this was the source of their dislike towards plaintiff. (*Id.* at 60).

Plaintiff testified that he began to believe that the general animosity towards him at work was based on Marshall's alleged desire to be plaintiff's homosexual lover or friend. (Pollard Dep. at 22–3).

On May 19, 1998, another incident occurred which caused plaintiff to become more dissatisfied with his employment. That evening, plaintiff and Officer Joe Conley were called to a domestic dispute. (*Id.* at 49). They differed in their opinions as to how to handle the dispute, as Conley did not want to make the arrest, but plaintiff did. (*Id* ). Plaintiff claims that Conley

asked him "Do you really want to do all that paperwork on this?" (*Id.* at 51).

Plaintiff contacted the shift sergeant, Sergeant Cairl, and "told him exactly what happened at the scene and Joe Conley's comment." (*Id.* at 52). Sergeant Cairl instructed plaintiff and Conley to return to the scene for further discussion with the witnesses. (*Id.* at 53). When Plaintiff later wrote up and submitted his report, he included his dispute with Conley, Conley's alleged statement regarding the paperwork, and the fact that he disagreed with Conley about the manner in which the incident was handled. (*Id.* at 54). As is customary, the report was forwarded to the Wood County Prosecutor. (*Id.*).

After reading the report, plaintiff believed that several of his fellow officers were angry with him and felt that he had "ratted [Conley] out." (*Id.* at 57). Several officers, including Breno and Marshall, felt that plaintiff should not have included the dispute with Conley in the report because the report was forwarded to the prosecutor, thereby publicizing the internal dispute. (Breno Dep. at 26).

According to plaintiff, the negative feelings towards him at work intensified after this incident. (Pollard Dep. at 57). He claims that his fellow officers no longer said hello to him and that he felt no camaraderie with the other officers. (*Id.*). Plaintiff also stated that, after this incident, his fellow officers would not back him up. (*Id.* at 58). When asked if there was a specific time when plaintiff called for back up and nobody came, plaintiff answered "No." (*Id.*).

Plaintiff testified that, one day after the report incident, he went to a restaurant where officers routinely meet for meals. (*Id.* at 63). Conley and Tom Fall, another Northwood Police Officer, were standing outside the restaurant. (*Id.*). Plaintiff alleges that Conley said, "There's that fuck-

ing piece of shit", referring to plaintiff. (*Id.*). Plaintiff testified that he believed Conley had never gotten over the report, and that Conley, as well as several others in the department, "wrote [him] off" because he had disclosed too much information in the report. (*Id.* at 64).

The next incident occurred on June 19, 1998. On that day, plaintiff received a memorandum from the three shift sergeants, Cairl, Harrison and Marshall. (Pollard Dep. at Ex. G). Marshall testified that there had been discussions about various problems between plaintiff and the other officers on midnights. (Marshall Dep. at 20). The memo had no disciplinary ramifications, but instead contained criticism of plaintiff's style and suggestions for improving his style and ability to get along with his fellow officers. (Pollard Dep. at Ex. G).

The memo stated:

> [v]arious complaints received from other police officers and citizens have been brought to our attention concerning your interaction with people on a personal and professional level.... Much of the friction apparent between officers working the same shift with you was accentuated when you filed the crime report on the domestic violence situation.... It has been reported, by citizens you have stopped, that your demeanor is cocky and abrasive.... Additionally, several officers on this department feel that you are using this same approach when talking to them which may explain why some officers resent you.

(*Id.*).

Plaintiff obtained legal counsel and filed a memorandum entitled "Official Complaint" to Chief Doug Breno. (*Id.* at Ex. H). In the memo, plaintiff stated that he had been harassed by members of the police department:

> I am aware that my sexuality and my orientation to such was of great interest based on how the hiring and impressions of the candidates aired by a member of the staff. Since I have been here at Northwood those impressions of me and how I was hired are still causing a great deal of conflict and resentment within the department, even though I am NOT whom I was first perceived. The question of my sexual orientation was only the beginning though.

(*Id.*).

Plaintiff listed other incidents of what he called "hostile work environment," only one of which had any relation to sexual matters:

> Being at first perceived as 'someone's new buddy,' (you know exactly what I mean Chief) and being treated badly because of it (perceived sexual orientation issue).

(*Id.*).

On August 3, 1998, in response to this memo, Chief Breno arranged a meeting with plaintiff. (Breno Dep. at 19). Plaintiff complained to Breno that he was "being frozen out." (*Id.*). Plaintiff did not complain to Breno about anything Marshall said or did. (*Id.* at 17–19). Breno also testified that he had never perceived plaintiff to be a homosexual. (*Id.* at 24).

After the meeting, plaintiff testified that his fellow officers seemed more positive towards him and treated him better. (*Id.* at 170). Plaintiff attributed this attitude to the other officers being "scared for their jobs" and "just trying to cover themselves." (*Id.* at 169–70).

On September 10, 1998, plaintiff's physician, Dr. Robert Daiber, reported that plaintiff was suffering from stress and adjustment disorder and should be granted leave effective immediately. (Pollard Dep.

at Ex. M). Plaintiff, however, continued to work after that time. (*Id.* at 154).

On approximately September 23, 1998, plaintiff took medical leave for jaw surgery until mid-October 1998. (*Id.* at 137).

When plaintiff was due to return, he submitted the letter regarding stress leave from Dr. Daiber to Chief Breno. (*Id.* at 155). Plaintiff also submitted a letter from Rick Dorman, a counselor at Harbor Behavioral Health Care. (*Id.* at Ex. M and N). Mr. Dorman stated that plaintiff was suffering from major depression and that plaintiff reported work stress as a significant precipitant to these symptoms. (*Id.* at Ex. N).

On October 20, 1998, plaintiff met with Curtis. (Curtis Dep. at 17). At this meeting, Curtis asked plaintiff if Sergeant Marshall had made any sort of sexual advances towards him, and plaintiff stated that he had not. (*Id.* at 21). Plaintiff did tell Curtis that "he felt because of some perceived friendship with Sergeant Marshall that he ... was considered also gay." (*Id.*).

During the meeting, Curtis incorrectly told plaintiff that stress leave would be covered by workers' compensation. (*Id.*).

On October 20, 1998, Plaintiff's attorney, Francis Landry, drafted a letter to the City stating that plaintiff was no longer pursuing his claims against the City of Northwood. (*Id.* at Ex. O).

Curtis placed plaintiff on paid administrative leave on October 21, 1998, and began an investigation into plaintiff's allegations. (Curtis Dep. at 24). After interviewing several employees, Curtis determined that there was no objective evidence of sexual harassment. (*Id.* at 26).

On October 22, 1998, Curtis told plaintiff that mental stress was not a valid workers' compensation claim. (*Id.* at Ex. Q). Cur-

tis also scheduled plaintiff for a fitness for duty examination with Eric Summons, Ph.D, a psychologist. (*Id.* at Ex. R).

Summons indicated that plaintiff suffered psychological problems that would significantly impair his performance as a police officer for the City of Northwood. (*Id.* at Ex. S). Summons stated that plaintiff should not return to work until he had received proper treatment. Effective November 17, 1998, plaintiff was placed on leave pursuant to the Family and Medical Leave Act ("FMLA"). (Pollard Dep. at 177).

On February 8, 1999, the day before plaintiff's FMLA leave was to expire, plaintiff submitted a letter to the City stating that, although plaintiff was taking an antidepressant called Zoloft, plaintiff was capable of returning to work at that time. (*Id.* at Ex. U).

After receiving the letter from Dorman, Curtis scheduled another fitness for duty exam with Dr. Summons. On February 10, 1999, Summons issued a letter stating that plaintiff had psychological problems that would significantly impair his ability to perform as a police officer. (*Id.* at Ex. W).

Plaintiff was referred to Dr. Graves for a second opinion. Graves also determined that plaintiff was not fit for duty. (*Id.* at Ex. X).

On May 25, 1999, plaintiff filed a charge with the Ohio Civil Rights Commission claiming he was sexually harassed by Marshall, that he was discriminated against on the basis of his disability, and that, although disabled, he could substantially perform the essential functions of the job. (*Id.* at Ex. DD).

Plaintiff specifically claims that from May to June 1997, during plaintiff's training and later during his employment with

Northwood, Marshall would often talk about his sexual activity with other men in plaintiff's presence. (Doc. 51 at 2). Marshall also allegedly talked about how he likes "cocks" on one occasion in plaintiff's presence. (*Id.*).

Plaintiff also alleges that Marshall called plaintiff "honey" in July of 1998. (*Id.*). Plaintiff claims he was called Marshall's "buddy" or his "friend" by other officers when Marshall was in the area. Plaintiff claims that the general attitude towards homosexuality was evidenced by Officer Conley's remark to Marshall that he is a "fucking faggot." (*Id.* at 4). In addition, plaintiff makes numerous claims considering the officers generally demeaning attitude towards him and other incidents of "unfair criticism" and reprimands. (*Id.* at 2, 3).

On June 28, 1999, an article appeared in the METRO PRESS, a local Northwood newspaper. (*Id.* at Ex. CC). The subject of the article was the sexual harassment charge filed by plaintiff.

## DISCUSSION

### A. Hostile Work Environment Claim

Title VII prohibits an employer from discriminating against an individual based on the individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a)(1). In addition, the statute prohibits discrimination based on an employee's sex that creates a hostile or abusive work environment. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999) (*citing Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

To constitute a hostile work environment, plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 187 F.3d at 560 (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). When considering whether the harassment is severe or pervasive, the court must consider the "totality of circumstances" and whether a "reasonable person in the plaintiff's position would find the environment severely hostile." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Plaintiff must establish: 1) he was a member of a protected class; 2) he was subject to unwelcomed sexual harassment; 3) the harassment was based on his sex; 4) the harassment created a hostile work environment. *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 183–184 (6th Cir.1992). Once a plaintiff establishes harassment, the court examines whether there has been a "tangible employment action." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). If not, employers are liable unless they took reasonable care to prevent and correct the behavior. *Id.* If the employer did take tangible employment action, the employer is liable under Title VII without any further demonstration by the plaintiff. *Id.*

The allegedly harassing conduct does not have to be sex-based in order to establish a hostile work environment claim, if plaintiff can show that but for his sex, he would not have been the object of harassment. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000). "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the oth-

er sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

Using the above analysis, I find as a matter of law that, taking all of plaintiff's allegations as true, plaintiff has not established a hostile work environment.

■ Plaintiff relies on the following allegations: 1) Marshall is a homosexual; 2) Marshall told him he would help plaintiff move from Cincinnati when plaintiff was first hired; 3) Marshall told plaintiff that he could live with him until he got his feet off the ground; 4) Marshall talked about his sexual activity with other men in plaintiff's general presence; 5) Marshall talked about how he likes "cocks" on one occasion in plaintiff's presence; 6) Marshall called plaintiff "honey" on one occasion; 7) other officers referenced plaintiff as Marshall's "buddy" or "friend"; and 8) one officer referred to Marshall as "fucking faggot." (Doc. 51 at 1–4). Plaintiff's other allegations include general complaints concerning the alleged rudeness of other officers towards him and receiving unfair criticism for his job performance. (*Id.* at 3). Plaintiff, however, has produced no evidence demonstrating that this attitude was based on his alleged status as Marshall's "homosexual buddy."

In *Bowman*, the Sixth Circuit affirmed the district court decision granting summary judgment for the defendant on the plaintiff's sexual harassment claim. 220 F.3d at 458. The plaintiff, a male, alleged that his supervisor, a female, sexually harassed him by: 1) placing her hand on his shoulder and rubbing it for about two seconds; 2) stating that "she controlled [plaintiff's] ass and she could do whatever she wanted with it" after grabbing the plaintiff's buttocks; 3) telling plaintiff that they should get into the whirlpool together; 4) telling the plaintiff that he should come to her house without his girlfriend;

5) placing her hands on the plaintiff and pushing him towards a door. *Id.* at 459.

The Sixth Circuit held that the conduct did not constitute severe and pervasive conditions, comparing the facts to those of *Williams*, 187 F.3d at 565–66, where the plaintiff alleged fifteen separate allegations of sexual harassment over a period of one year including derogatory and offensive remarks about women in general. The Sixth Circuit noted that while the plaintiff in *Bowman* "may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender." 220 F.3d at 464. The Sixth Circuit held that more evidence was needed to show the harassment had an anti-male bias to prevent Title VII from being used as a "general civility code." *Id.*

Plaintiff's alleged facts are more akin to those of *Bowman* rather than those of *Williams*. As such, they are insufficient to establish that plaintiff was subjected to a hostile work environment. *See also Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000) (affirming grant of the defendant's motion for summary judgment for sexual harassment claim based on a single battery coupled with two offensive remarks over a six-month period); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir.2000) (offhanded comments and isolated incidents including a sexual advance insufficient to establish discriminatory cause of action).

## B. Retaliation

■ A prima facie case for retaliation includes evidence that 1) the plaintiff engaged in an activity protected by Title VII; 2) that the exercise of the plaintiff's rights were known by the defendant; 3) that the plaintiff suffered an adverse employment action; and 4) that there was a causal connection between the protected activity

and the adverse employment action. *Williams,* 187 F.3d at 568 (*citing Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987)). If the plaintiff establishes the prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reasons for its action. *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990). The plaintiff must demonstrate that the proffered reason was not the true reason for the decision. *Id.*

On July 24, 1998, plaintiff submitted a complaint to his supervisor, Breno, which included a statement that "I am aware that my sexuality and my orientation to such was of great interest ... and those impressions of me and how I was hired are still causing a great deal of conflict and resentment within the department...." (Pollard Dep. at Ex. H). Plaintiff has, therefore, established that he engaged in a protected Title VII activity of which the City knew. The City also refused to allow plaintiff to return to work after he alleged he had recovered from his psychological condition. Plaintiff has not produced any evidence to establish that there was a causal connection between his departure and his sexual harassment complaints.

■ Even assuming that plaintiff had established a prima facie case, the City provided a legitimate, nondiscriminatory reason for its action. At the time that plaintiff sought to return to work, he was deemed incapable of performing his job as a police officer due to his psychological condition, as evidenced by the reports of two examining psychologists. (Pollard Dep. at Ex. W, X, and Y). The City informed plaintiff that no other vacancies for suitable employment with the City existed at that time. (*Id.* at Ex. Z). Plaintiff has not provided any evidence that the City's provided reason was pretextual. I find, therefore, that the City's motion for

summary judgment is granted as to this claim.

## C. Discrimination Based on Disability

■ A plaintiff establishes a prima facie case of disability discrimination by proving 1) he was "disabled" within the meaning of the ADA, 42 U.S.C. § 12101; (2) he was qualified for the position, with or without an accommodation; (3) he suffered an adverse employment decision with regard to the position in question; and 4) a non-disabled person replaced him or was selected for the position that the disabled person sought. *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 882 (6th Cir.1996).

■ To recover under the ADA, the plaintiff must establish as part of the prima facie case that he was a qualified individual with a disability at the time of the discriminatory act. *Kocsis,* 97 F.3d at 884. Plaintiff has failed to do so.

■ Both Dr. Summons and Dr. Graves determined that plaintiff was not fit for duty based on a major depressive disorder. (*Id.* at Ex. W, X). Plaintiff, therefore, was not qualified for the position at the time of the alleged discrimination. In addition, although plaintiff was given the option to consider a temporary layoff with the City, he testified that he did not pursue that possibility because in his opinion, it was "illegal." (*Id.* at 189, Ex. AA).

■ Plaintiff also alleges that the City should have accommodated his condition by allowing him to work at a desk job. (Doc. 51 at 10). Plaintiff, however, has failed to show that such jobs were available at that time, or that he would have been qualified for that position. (Pollard Dep. at Ex. Z).

## D. Disclosure of Confidential Medical Records

The ADA provides that an employer may "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). Information obtained by the employer regarding the employee's medical condition must be maintained in separate medical files and treated as a confidential medical record. 42 U.S.C. § 12112(d)(4)(C).

Curtis was interviewed about plaintiff's sexual harassment claim and his statements were published in an article of The Press on June 28, 1999:

> [Plaintiff] was given a fitness for duty evaluation by Dr. Eric Summons ... as well as an evaluation by psychologist Wayne Graves, both of which allegedly show he is unfit to be a police officer, said Mr. Curtis.... Mr. Curtis implied Mr. Pollard was potentially dangerous. 'I was afraid of him. I didn't want an officer on Prozac walking around with a gun,' Mr. Curtis said of Mr. Pollard.... News editors of The Press who were examining the personnel files of Mssrs. Pollard and Marshall last week were told by Mr. Curtis that Pollard's psychological evaluations are not public record and therefore not subject to review by the media.

(Pollard Dep. at Ex. CC).

■■■ Plaintiff has established a genuine issue of material fact concerning the illegal disclosure of confidential medical records. Although the article states that the evaluations were not public record, Curtis's remarks to the newspaper disclosed the contents of the evaluations. His first comment that plaintiff was "unfit to be a police officer" is general in nature. His second comment that Curtis was "afraid" of plaintiff because he didn't want an officer "on Prozac" on the police force might be found to have constituted a disclosure

of the results of the evaluation. Although plaintiff was taking Zoloft, a similar antidepressant, and not Prozac, this statement, a jury could find, illegally disclosed plaintiff's psychological condition based on the results of his evaluation. *See Cossette v. Minnesota Power & Light,* 188 F.3d 964 (8th Cir.1999) (recognizing claim of unlawful disclosure of medical records as a violation of the ADA); *Keene v. Teco Energy Corp.,* 2000 WL 230243, *5, 2000 U.S. Dist. LEXIS 2271, *14 (M.D.Fla. March 1, 2000) (allowing plaintiff to bring ADA claim based on illegal disclosure of confidential medical records).

■■■ Furthermore, a plaintiff does not have to be a qualified individual with a disability to gain protection under 42 U.S.C. § 12112(d)(4). *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1229 (10th Cir.1997) (allowing the plaintiff to maintain ADA claim based on 42 U.S.C. § 12112(d)(4) even though the plaintiff had not established she was an individual with a disability); *Cossette,* 188 F.3d at 969 ("the plaintiff need not be disabled to state a claim for the unauthorized gathering or disclosure of confidential medical information").

Next, the City argues that plaintiff failed to meet the jurisdictional prerequisite of filing a complaint with the EEOC because the complaint did not specifically mention records or confidentiality violations. (Doc. 48 at 32). I disagree.

■■■ To recover under Title I of the ADA, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the violation at issue (if he does not file an initial charge with a state agency). 42 U.S.C. § 12117(a); *Carmack v. Matco Tools,* 1999 WL 196527, 1999 U.S.App. LEXIS 5365, * 3 (6th Cir. March 22, 1999) (unpublished) (*citing Stewart v. County of Brown,* 86 F.3d 107, 110 (7th Cir.1996)).

After pursing relief with the EEOC, the judicial complaint is limited to "the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Cameron v. Bd. of Educ. of Hillsboro*, 795 F.Supp. 228, 234 (S.D.Ohio 1991) (*citing Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir.1991)).

■ Plaintiff filed a complaint with the Ohio Civil Rights Commission and EEOC. (Pollard Dep. at Ex. DD). Plaintiff checked the box marked disability, as the cause of discrimination, and stated:

> I believe I have been unlawfully discriminated against due to respondent's consideration of my disability inasmuch as: a. Action was taken by respondent, at least in part, because I am disabled; b. Though disabled, I can safely and substantially perform the essential function of the job in question.

(*Id.*).

Based on the remedial nature of Title VII, I find that plaintiff has adequately presented the claim to the EEOC.

Disclosure to The Press occurred after the charge of disability discrimination was filed. The event, however, was related to the charge of disability discrimination, and as such would be a reasonable extension of the EEOC investigation. *See Ang*, 932 F.2d at 546 (finding district court could have concluded the EEOC complaint was adequate based on the similar nature of the plaintiff's race and national origin claims). The City's motion for summary judgment is denied as to this claim.

### E. Violation of 29 C.F.R. § 825.307 of the FMLA

The City required plaintiff to submit to a fit for duty examination by Dr. Summons, who is employed on a regular basis by the City. (Doc. 51 at 12). Plaintiff alleges that this was a violation of 29 C.F.R. § 825.307 of the FMLA. This section governs an employee who seeks to take leave under FMLA. It allows an employer, who has reason to doubt the validity of a medical certification, to require the employee to obtain a second opinion at the employer's expense to determine whether the employee is eligible for FMLA leave. If the employer chooses to do so, the selected health care provider "may not be employed on a regular basis by the employer." 29 C.F.R. § 825.307(a)(2).

■ Plaintiff's claim is without merit. Plaintiff objects to the examination by Dr. Summons on November 4, 1998. (Doc. 51 at 12). After this examination, Dr. Summons wrote a report stating that plaintiff should be granted FMLA leave. Plaintiff, therefore, would not have any objection to this report.

Plaintiff also objects to the examination by Dr. Summons on February 10, 1999. (*Id.*). At that time, however, plaintiff's FMLA leave had expired, and Dr. Summons was examining plaintiff to see if he was able to return to work, which plaintiff hoped to do, and not to determine whether he was eligible for additional FMLA leave. The City's motion, therefore, will be granted as to this claim.

### F. Intentional Infliction of Emotional Distress

Plaintiff alleges that Marshall's alleged conduct and comments constitute an intentional infliction of emotional distress. I disagree.

■ To establish this claim, a plaintiff must prove: 1) the defendant's conduct was extreme and outrageous; 2) the conduct was intentional or reckless; and 3) it caused severe emotional distress. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983). To qualify as extreme and outrageous, the conduct must

"go beyond all possible bounds of decency" and does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* at 375, 453 N.E.2d 666.

■ Marshall's alleged discussion about his sexual activity with other men in plaintiff's general presence, his stating on one occasion that he likes "cocks", and calling plaintiff "honey" on one occasion do not rise to the level of extreme and outrageous, but rather are "indignities" or "annoyances." *Id.* The City's motion for summary judgment is, therefore, granted.

## G. Defamation

■ A defamation claim requires a showing of: 1) a false and defamatory statement concerning another, 2) an unprivileged publication to a third party, 3) fault amounting to at least negligence by the publisher, and 4) either the actionability of the statements regardless of special harm or the existence of special harm caused by the publication. *Piro v. Franklin Township,* 102 Ohio App.3d 130, 656 N.E.2d 1035 (1995)

■ Where the defamatory statements concern a public official, the official must also prove by clear and convincing evidence that the statements were made with actual malice. *Scott v. News–Herald,* 25 Ohio St.3d 243, 496 N.E.2d 699 (1986). Actual malice is established by showing "with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity." *Deoma v. City of Shaker Heights,* 68 Ohio App.3d 72, 82, 587 N.E.2d 425 (1990).

■ As a police officer, plaintiff was a public official. *Mueller v. Storer Communications,* 46 Ohio App.3d 57, 58, 545 N.E.2d 1317 (1988).

■ Furthermore, truth is a complete defense to a claim for defamation. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank,* 75 Ohio St.3d 433, 445, 662 N.E.2d 1074 (1996).

Plaintiff alleges that the following language, published in The Press, is defamatory:

> Mr. Curtis implied Mr. Pollard was potentially dangerous. 'I was afraid of him. I didn't want an officer on Prozac walking around with a gun,' Mr. Curtis said of Mr. Pollard.

(Pollard Dep. at Ex. CC).

■ Plaintiff has established a genuine issue of material fact concerning the defamatory nature of the statements. Curtis had no knowledge that plaintiff was "potentially dangerous." Furthermore, plaintiff was not taking Prozac. Although Curtis stated that he did not want "an officer" on Prozac walking around with a gun, the statement is reflected upon plaintiff in light of its preceding sentence. Such statements, therefore, were arguably made with knowledge of falsity and could be considered defamatory in nature. The City's motion for summary judgment is accordingly denied as to this claim.

## H. Individual Liability

The City moves for summary judgment as to the individual liability of defendants Breno, Marshall and Curtis. The motion is granted as to defendants Breno and Marshall, as all underlying claims against them have been dismissed. *Hiler v. Brown,* 177 F.3d 542, 546 (6th Cir.1999) (individuals cannot be liable under the ADA). Because the City's motion concerning the defamation claim is denied, defendant Curtis is not dismissed as an individual defendant.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT the City's motion for summary judgment be granted in part and denied in part.  (Doc. 48).

So ordered.