**Linda S. STUKEY, Plaintiff,**

v.

**UNITED STATES AIR FORCE, et. al.**

**No. C-3-87-225.**

United States District Court,
S.D. Ohio, W.D.

March 31, 1992.

See also 790 F.Supp. 165.

---

Lee Hornberger, Cincinnati, OH, for plaintiff.

Patrick Dennis Quinn, U.S. Attorney's Office, Dayton, OH, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge.

This matter is before the Court following a trial to the Court on March 2, 3, 4, 5, and 9, 1992.

In rendering our decision of this matter, we have considered the testimony of the witnesses, the documents admitted into evidence, the Plaintiff's proposed findings of fact and conclusions of law (doc. 68), and the Defendants' proposed findings of fact and conclusions of law (doc. 70). Both parties have also submitted Supplemental Findings of Fact and Conclusions of Law (docs. 91 and 92).

In weighing the testimony of the witnesses, we considered each witness' relationship to the Plaintiff or to the Defendant; their interest, if any, in the outcome of the trial; their manner of testifying; their opportunity to observe or acquire knowledge concerning facts about which they testified; and the extent to which they were supported or contradicted by other credible evidence. This litigation has brought out strong emotions on both sides. We believe that this emotion has led witnesses to embellish their testimony. We have attempted to ferret out fact from fiction.

Under Fed.R.Civ.P. 52, we set forth our findings of fact and conclusions of law.

The essential issue in this case is whether gender was a motivating factor in the Defendants' decision not to hire the Plaintiff. Furthermore, we must decide whether the Defendants retaliated against the Plaintiff for filing an EEO claim in pursuit of this lawsuit.

## FINDINGS OF FACT

1. The Plaintiff, Linda S. Stukey, worked as a civilian employee in the Office of the Staff Judge Advocate at Wright–Patterson Air Force Base in Dayton, Ohio from 1981 until November 1985. The legal office, for which Ms. Stukey worked, gave advice to the Wing Commander who ran the day-to-day operations at Wright–Patterson.

2. Ms. Stukey received several promotions in her work legal office at Wright–Patterson. She began her employment as a GS–9, but moved up to GS–12 by September 1983. In 1984 and 1985, she received step increases, based upon satisfactory job performance.

3. However, Ms. Stukey experienced some difficulties in getting along with work colleagues. In her work in the environmental law area, the Base Staff Judge Advocate General's Office recommended that Ms. Stukey not attend meetings with personnel in the civil engineering department, because of Ms. Stukey's personality conflicts.

4. At one point, Ms. Stukey complained of her excessive workload, in comparison to her supervisor. An outside investigator, Mr. Pedersen, concluded that the workload was relatively equal between Ms. Stukey and her supervisor.

5. In 1982, Ms. Stukey was assigned to the Labor Law Division of the Base Staff Advocate Office. In this position, she became familiar with the mechanics and processes of sex discrimination lawsuits.

6. During 1984, Ms. Stukey had several lunches with James Gill and James Mahoy. Mr. Gill, Mr. Mahoy, and Ms. Stukey were all friendly with one another. Mr. Gill and Mr. Mahoy were teachers at the School of Systems and Logistics at the Air Force Institute of Technology ("AFIT").

7. AFIT is a North Central accredited school of higher education at Wright–Patterson Air Force Base. The legal office, for which Ms. Stukey worked, is not formally connected with AFIT. AFIT and the legal office are approximately five miles from each other and separated by a major highway. However, personnel have shifted back and forth between AFIT and the legal office.

8. At one particular lunch with Mr. Gill and Mr. Mahoy, Ms. Stukey expressed dissatisfaction with her job in the legal office at Wright–Patterson. Mr. Gill and Mr. Mahoy informed Ms. Stukey that a teaching job might be opening at AFIT. Ms. Stukey had previously applied three times for a teaching job at AFIT, but had never received an offer.

9. The teaching positions, or professorships, were appointments for not more than three years. At the end of the three years, tenure is generally granted, along with a substantial pay increase. In addition, AFIT professors are permitted to practice law part-time, outside of AFIT.

10. In December of 1984, two teaching positions at AFIT opened, and Ms. Stukey applied for the positions.

11. An affirmative action plan was established in part to guide AFIT in its hiring decisions. *See* Plaintiff's trial ex. 10.

12. AFIT formed a five member subcommittee to conduct the selection process for the positions. The members of the selection panel were William Dean, Ernest Spitzer, John Garrett, James Mahoy, and Michael Schubert. All were male.

13. Mr. Mahoy had earlier told Major Mary Mudd, a teacher at AFIT but an applicant for the job, that it was embarrassing for a woman to correct a man. Mr. Mahoy specified that a female instructor, such as Ms. Mudd, should not correct a male student. Mr. Mahoy further felt that proof-reading was a proper task for women in law school.

14. Mr. Gill, a teacher at AFIT, frequently referred to Mr. Mahoy's secretary

as "Miss Kitty." Ms. Mudd informed Mr. Gill that she considered this to be sexist, but he continued to call Mr. Mahoy's secretary "Miss Kitty."

15. Applicants first had to meet initial selection criteria. The selection committee then awarded points for different levels of professional attainment and teaching experience for those applicants who had met the initial selection criteria. Each member of the selection committee ranked the candidates separately and returned their scores to Mr. Dean. Mr. Dean compiled the scores and computed an average score for each applicant.

16. Selection committee members regularly disagreed with one another on how many points should be awarded to an applicant. For instance, no specific criteria existed for measuring teaching experience. Thus, the assignment of points for professional attainment and teaching experience involved some degree of subjectivity.

17. After the veterans preference points were added in, Ms. Stukey ranked thirteen out of sixteen qualified applicants.

18. Ms. Stukey had several experiences in teaching. Ms. Stukey directed educational seminars at Central State University and Antioch College from 1978 until 1981. In addition, Ms. Stukey had conducted seminars on a variety of legal topics, including labor law, poverty law, and housing law. Ms. Stukey had also been managing attorney for the Greene County Legal Aid Office from 1978 until 1981.

19. In contrast, one successful male candidate had only taught freshman chemistry at the University of Maryland in 1966–67. Nevertheless, the selection committee gave the male candidate substantially more teaching points than Ms. Stukey in the selection committee's evaluation.

20. After several applicants withdrew their applications, the selection committee interviewed eight candidates, including Ms. Stukey, for the two positions at AFIT.

21. The interview process consisted of a mock teaching segment on the subject of termination for default in the government contracts area, followed by an informal interview consisting of questions about the candidate's background and experiences. The teaching segments were videotaped, as well as a portion of the informal interview.

22. Ms. Stukey received assistance in preparing for her presentation from James Gill, who was a member of the AFIT faculty. Mr. Gill recommended that Ms. Stukey contact Peg Arnold, the Wright–Patterson Terminations Contracting Officer, for additional assistance. As a result, Ms. Stukey consulted with Ms. Arnold to prepare for her interview.

23. Ms. Stukey arrived at the interview a few minutes early. Prior to the start of the March 25, 1985 interview, selection committee member Ernest Spitzer spoke with Ms. Stukey. In this conversation, Mr. Spitzer questioned Ms. Stukey about her divorce and her child care arrangements. Ms. Stukey claimed that she was rattled by these questions, which, as a labor lawyer, she knew were improper. Consequently, Ms. Stukey went to the water fountain to compose herself prior to her interview. Mr. Garrett then told Ms. Stukey that she looked nice.

24. Mr. Gill also sat in on Ms. Stukey's interview. Faculty members at AFIT were encouraged to attend the interviews of candidates. Mr. Gill, however, did not score Ms. Stukey's interview, because he was not a member of the selection committee.

25. Mr. Garrett and Mr. Dean, both selection committee members, testified that, prior to the interview, Ms. Stukey had a chance of being selected for one of the two positions.

26. Members of the selection committee testified that Ms. Stukey's teaching presentation was "disastrous." *See e.g.,* Testimony of John Garrett. After carefully watching the videotape of Ms. Stukey's presentation and the videotape of one of the male selectees, we disagree. Despite being rattled by Mr. Spitzer's improper questions just prior to the start of the interview, Ms. Stukey gave a competent lecture on terminations for default. Although she was closely tied to her notes, Ms. Stukey was well-prepared and handled questions aptly.

She did not appear overly nervous or tentative.

27. After the mock teaching segment of the interview concluded, Ms. Stukey sat down in front of the selection committee for the informal interview.

28. The selection committee did not have a set list of questions for the informal interview. However, the Department of the Air Force had issued a memorandum concerning interviewing, in which it cautioned:

> Don't. Ask about the candidate's personal life except as it is pertinent to the job being fulfilled.... Don't. Ask questions which, although well intended, may give the impression that you have a different perspective concerning females candidates.

Plaintiff's ex. 6, at 16.

29. Despite the admonitions in this memorandum, the selection committee asked Ms. Stukey a series of gender-based, non-job related questions. The selection committee asked Ms. Stukey such questions as whether she could be happy working in an environment with a bunch of old men and whether she worked well with men. Furthermore, the selection committee questioned Ms. Stukey whether she would be willing to travel with men and how she would handle her children when she travelled. Male applicants were not asked these sort of questions.

30. Mr. Gill asked many of the non-job related questions, particularly about Ms. Stukey's willingness to travel with men. Mr. Gill testified that he had asked these questions in order to diffuse a rumor concerning Ms. Stukey. According to this rumor, Ms. Stukey had allegedly engaged in sex while travelling on business. From conversations with fellow faculty members, Mr. Gill knew that at least some of the members on the selection committee knew of this rumor.

31. In evaluating Ms. Stukey, the selection committee allotted Ms. Stukey three points out of ten on her interview. Ms. Stukey's score on the interview tied for lowest score given by the selection committee. The selection committee arrived at Ms. Stukey's score by consensus at the conclusion of all the interviews.

32. As a result of her score on the interview, Ms. Stukey ranked eighth among the applicants.

33. The selection committee recommended that the two highest ranked applicants be hired. Those two applicants were males. The selection committee further recommended that if either of the top two candidates did not accept the job, then the open position should be readvertised.

34. The two highest scoring applicants, both males, accepted the teaching positions. AFIT never offered the job to Ms. Stukey.

35. The third highest scoring applicant was Major Mary Mudd. Major Mudd would have been one of the top two applicants had her veterans' preference points been properly added in to her score.

36. Major Mudd was the only female teaching at AFIT.

37. The Department Chairman, William Pursch, and the Dean, Larry L. Smith, approved the selection committee's recommendation. These two individuals did not individually review each applicants' record. Instead, their practice was to essentially rubber-stamp the selection committee's recommendation unless strong objections were raised.

38. Ms. Stukey was offended and humiliated by the interview. The next day, she telephoned a series of individuals, including some of the men who conducted the interview. Ms. Stukey alleged that Mr. Garrett stated that the selection committee agreed not to hire a woman. Ms. Stukey further testified that Mr. Mahoy told her that the selection committee would not hire Major Mudd because she was a "bitch." During some of Ms. Stukey's telephone conversations about her interview, Ms. Stukey insinuated that she might take recourse.

39. On April 24, 1985, Ms. Stukey filed an informal complaint. She requested confidentiality.

40. After an investigation by the EEO counselor, Lynne Ranney, Ms. Stukey filed a formal complaint on October 9, 1985.

41. On October 25, 1985, Ms. Stukey submitted her resignation from Wright–Patterson to be effective November 25, 1985.

42. Ms. Stukey experienced a series of problems at work in 1985.

43. In July 1985, Ms. Stukey had a vacation planned in Canada. Robert Clayton, Ms. Stukey's supervisor, altered Ms. Stukey's vacation without giving her a reason. However, vacation schedules were often changed in the legal office, depending upon the demands of the office.

44. When Ms. Stukey did take her vacation, she returned to find her computer removed. Colonel Bexten had removed Ms. Stukey's computer, because Ms. Stukey was using the computer in aid of her EEO complaint, not for needs of the legal office. The removal of the computer did not deny Ms. Stukey access to the computer system, but only restricted her to the use of terminals in open areas in order to encourage her to use the computer exclusively for official business.

45. On August 16, 1985, many of Mr. Clayton's private files were copied to Ms. Stukey's computer files and then deleted. Mr. Clayton suspected Ms. Stukey had deleted his personal files, some of which contained material about her.

46. As a consequence of the missing computer files, the base commander appointed an independent investigating officer. The independent investigating officer concluded that Ms. Stukey may have deleted the missing computer files.

47. However, on August 16, 1985, Ms. Stukey was not in the office, and therefore could not have deleted the computer files. Neither personnel in the legal office nor the independent investigator were aware of Ms. Stukey's alibi. In fact, the investigator had told Ms. Stukey that the night the computer files were deleted was August 23, 1985. Ms. Stukey eventually learned of the August 16, 1985 date during the course of this litigation.

48. Ms. Stukey cited at trial that Mr. Clayton had refused to allow her time to process her grievance. However, Mr. Clayton testified that he had no objection to her processing her grievance so long as Ms. Stukey kept her scheduled legal assistance appointments. Mr. Clayton wrote two memos on the subject in September 1985 and stated that, "I am not opposed to Ms. Stukey having additional official time if it is reasonable based upon the facts and circumstances of her individual case.... It may be possible and certainly more reasonable to grant her additional official time if she requests it for hours when she is not or should not be scheduled to see legal assistance clients." Joint ex. V–3, at 19.

49. After returning from sick leave in October of 1985, Ms. Stukey's office had been moved. Her new office was referred to as the "broom closet." Ms. Stukey's new office was considerably smaller and devoid of windows. The office, however, did contain the essentials for an attorney's office.

50. The move of Ms. Stukey's office was part of an office-wide reorganization which was announced at the staff meeting prior to its occurrence when Ms. Stukey was on sick leave. Two paralegals moved into Ms. Stukey's old office.

51. At Colonel Matlock's promotion party on October 1, 1985, Ms. Stukey testified that people at the party were discussing her EEO complaint, despite the fact that she requested confidentiality when she filed her complaint. However, neither Colonel Matlock nor Ann Koch, a friend of Ms. Stukey who attended the party, could remember any conversation concerning Ms. Stukey's EEO complaint.

52. Finally, on October 15, 1985, Ms. Stukey announced to Colonel Matlock that she was resigning, effective in November.

53. Charles Sexten, then Chief of the Employee Relations Branch of Civilian Personnel, could not recall whether Ms. Stukey mentioned retaliation to him when she left. However, Mr. Sexten testified that retaliation claims are extremely infrequent. The last one he could recall was from the late 1970's.

54. An employee must fill out an SF 50 Personnel Action Form which formally rec-

ords an employee's resignation. This Form contains a block entitled "Reason for Leaving." If the employee indicates in any manner that the reason for leaving is EEO-related, the personnel staff is trained to immediately refer the matter to the EEO counselor. Ms. Stukey's case was never referred to an EEO counselor.

55. Ms. Ranney, the EEO counselor did not remember and did not have any record of any contemporary allegation of retaliation.

56. Carolyn Smith, assigned to the Air Force Civilian Appellate Review Agency, Appellate Examining Division, conducted an investigation into Ms. Stukey's claim of sex discrimination. The issue of retaliation was not raised in Ms. Smith's report. *See* Joint Ex. I, Report of Investigation. Ms. Stukey never requested reconsideration of Ms. Smith's report.

57. Ms. Stukey first formally raised the issue of retaliation in her amended complaint, filed with this Court on May 9, 1989.

58.

## CONCLUSIONS OF LAW
### *Sex Discrimination Claim*

Ms. Stukey has sued, alleging that the Defendants failed to select her for one of the AFIT teaching positions because of her gender in violation of Title VII, 42 U.S.C. § 2000e (1991).

■ Congress enacted Title VII to ensure non-discriminatory employment decisions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). A plaintiff may prove sex discrimination by either direct or indirect evidence. *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985), *cert. denied,* 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627. Ms. Stukey has not presented any direct evidence that "... gender was a factor in the employment decision at the moment it was made...." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 1790, 104 L.Ed.2d 268 (1989). The selection committee awarded points to the candidates by consensus at a meeting following the inter-

views. No direct evidence came before the Court on how the selection committee actually arrived at the decision that Ms. Stukey should receive three points for her interview.

■ Therefore, we must now determine whether the Plaintiff can prove her case by indirect or circumstantial evidence. This determination must be made under the burden-shifting method of proof outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Burdine,* 450 U.S. 248, 101 S.Ct. 1089. We must first determine whether Ms. Stukey has established a *prima facie* case. As a woman, Ms. Stukey is a member of a protected class. Ms. Stukey met the initial selection criteria in her application for a teaching position at AFIT, and as a result, she was one of sixteen qualified applicants. Thus, Ms. Stukey has established a *prima facie* case. *See Burdine* 450 U.S. at 253, 101 S.Ct. at 1093.

Because the Plaintiff has met her *prima facie* case, the burden shifts to the Defendants to articulate a legitimate, non-discriminatory reason for not hiring Ms. Stukey. The Defendants articulated the reason that Ms. Stukey was not hired because she did poorly on her mock teaching exercise, and because she did not have much teaching experience. Assuming these facts to be true, the Defendants have met their burden.

Thus, we must now consider whether the Plaintiff met her burden at trial to demonstrate by a preponderance of evidence at trial that the legitimate reasons offered by the Defendants at trial were not the true reasons for their actions, but rather served as a pretext for discrimination.

The critical inquiry is whether gender was a factor in the employment decision at the moment the employment decision was made. *Price Waterhouse,* 490 U.S. 228, 109 S.Ct. 1775. It is impossible for this Court to crawl into the collective minds of the members of the selection committee to discover why they did not hire Ms. Stukey. Therefore, this Court inevitably must rely

upon circumstantial evidence and the credibility of witnesses.

The preponderance of the evidence shows that the selection committee improperly used Ms. Stukey's gender in making its evaluation. We look first to the members of the selection committee. All were male. Mr. Mahoy, a key member of the selection committee, had earlier displayed an animus against female professionals. Mr. Mahoy had told Major Mary Mudd that it was embarrassing for a woman to correct a man. Mr. Mahoy further felt that proofreading was a proper task for women in law school.[1]

The strongest evidence that the selection committee discriminated against Ms. Stukey was the interview itself. Prior to the interview, Mr. Spitzer talked with Ms. Stukey, asking her improper questions about her divorce and her child care arrangements. Mr. Garrett told Ms. Stukey prior to the interview that she looked nice. Following the mock teaching session, Ms. Stukey was barraged by questions concerning her ability to work and travel with men. The selection committee asked Ms. Stukey about her children and how she planned to care for them when she travelled. Male candidates were not asked these questions. The Air Force had even issued a memorandum admonishing interviewers not to make such inquiries of female applicants.

The impropriety and sheer number of gender-based questions makes it reasonable to conclude that the selection committee gave Ms. Stukey a low rating because of her sex. Simply put, the men who asked Ms. Stukey a series of discriminatory questions were the same men who subsequently reached a consensus that her teaching presentation was "disastrous." After carefully reviewing the videotape of Ms. Stukey and one of the male selectees, this Court disagrees. Ms. Stukey gave a more competent lecture than the successful male candidate. Therefore, the weight of the evidence demonstrates that the selection committee did not hire Ms. Stukey because she was a female.

The Defendants have argued that the selection committee asked gender-based questions in order to help Ms. Stukey. Mr. Gill testified that he asked Ms. Stukey questions about her ability to travel and get along with men in order to quash a rumor that Ms. Stukey had engaged in sex while travelling on business. This argument is meritless. By making this argument, the Defendants acknowledge that the selection committee was concerned that a woman might engage in sex while travelling on business. The selection committee did not have this same concern about men travelling on business, as evidenced by the selection committee's failure to question male applicants on this same subject. As such, the selection committee has exhibited a double-standard. That is, women may be disqualified from the job for having sex while travelling on business, but it is irrelevant if men engage in sex while travelling.

This Court also finds other circumstantial evidence that the selection committee had an anti-female animus. The selection committee recommended that the school hire the two highest ranked applicants, both of whom were male. The selection committee further recommended that if either of the top two candidates did not accept the job, then the open position should be readvertised in order to find other candidates than those who had already applied. The Defendants never offered a credible explanation of why the selection committee made such a recommendation. The third highest applicant happened to be Major Mary Mudd, a female, who was already teaching at AFIT.[2] Major Mudd was the only female teacher at AFIT at the time. Given the lack of explanation by the Defendants, this Court concludes that the selection committee made this recommendation in order to prevent Major Mudd, the only

---

1. Furthermore, Mr. Gill, who attended Ms. Stukey's interview, frequently called Mr. Mahoy's secretary "Miss Kitty."

2. Moreover, had Ms. Mudd's veteran's preference points been properly added in, she would have been the second highest scoring candidate. The Defendants, however, failed to provide this Court a satisfactory explanation as to why all the male candidates had their veteran's preference points added in, but hers were not.

female faculty member, from continuing to teach at AFIT. AFIT faculty members simply did not want female colleagues.[3]

The Defendants also argue that even if Ms. Stukey had gotten the highest score on the interview, she still would not have received an offer for the position. This argument is not supported by the facts. Mr. Garrett and Mr. Dean, both selection committee members, testified that prior to the interview, Ms. Stukey had a chance of being selected for one of the two positions. Furthermore, the assignment of points for professional attainment and teaching experience involved some degree of subjectivity. Selection committee members regularly disagreed with one another on how many points should be awarded to an applicant. In fact, Ms. Stukey received less credit for her teaching experience than one of the successful male candidates, despite the fact that Ms. Stukey had superior teaching experience.

Therefore, we conclude that gender was a factor in the Defendant's decision not to hire Ms. Stukey. *Price Waterhouse,* 490 U.S. 228, 109 S.Ct. 1775. The legitimate reasons offered by the Defendants for her non-selection were not the true reasons for their actions, but rather served as a pretext for discrimination.

### Retaliation Claim

We must now determine whether the Defendants retaliated against Ms. Stukey because she filed an EEO complaint in 1985 after not having been selected for a position at AFIT.

A *prima facie* case of retaliation or reprisal arises when a plaintiff establishes that: (1) she engaged in an activity protected under Title VII; (2) the employer subjected her to an adverse employment decision; and (3) a causal link exists between the protected activity and the employer's action. *Zanders v. Nat'l R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990).

■ However, in order to pursue a retaliation claim, a plaintiff must first exhaust her administrative remedies. *See Brown v. Gen. Serv. Admin.,* 425 U.S. 820, 823–33, 96 S.Ct. 1961, 1963–68, 48 L.Ed.2d 402 (1979); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 547 (6th Cir.1991). Ms. Stukey, an attorney with experience in labor law, never alleged retaliation in her informal administrative complaint or her formal administrative complaint. She filed her informal complaint on April 24, 1985, and her formal complaint on October 9, 1985. Many of the alleged acts of retaliation occurred prior to October 9, 1985. Therefore, under *Ang,* Ms. Stukey is barred from asserting those instances of retaliation now, because she failed to exhaust her administrative remedies. *See id.*[4]

■ Additionally, Ms. Stukey fails to show that a causal link existed between the protected activity and her employer's action. In other words, Ms. Stukey has never demonstrated that the filing of her complaint caused the unpleasant experiences she had at work in the summer and fall of 1985. Instead, the weightier evidence reveals that the problems Ms. Stukey encountered at work were the result of Ms. Stu-

---

**3.** Ms. Stukey testified that Mr. Garrett told her after the interview that selection committee agreed not to hire a woman. Ms. Stukey further testified that Mr. Mahoy told her after the interview that Ms. Mudd was not hired because she was a bitch. Whether or not Mr. Garrett and Mr. Mahoy actually made these statements, we find that they are consistent with the selection committee's decision-making. Moreover, while Mr. Mahoy is dead, the Defendants could have, but did not, call Mr. Garrett to refute Ms. Stukey's testimony.

**4.** Furthermore, Ms. Stukey had many other opportunities to assert a claim of retaliation, but failed to do so. Ms. Stukey never mentioned

retaliation in her exit form, which asked for her "Reason for Leaving." Carolyn Smith, assigned to the Air Force Civilian Appellate Review Agency, Appellate Examining Division, conducted an investigation into Ms. Stukey's claim of sex discrimination. The issue of retaliation was not raised in Ms. Smith's report. *See* Joint Ex. I, Report of Investigation. Ms. Stukey never requested reconsideration of Ms. Smith's report. Finally, in her original Complaint with this Court, Ms. Stukey did not claim retaliation. Given that Ms. Stukey had experience as a labor lawyer, these facts give little credence to Ms. Stukey's claims of retaliation.

key's pattern of difficulties in getting along with co-workers.

Ms. Stukey never demonstrated that her superiors even knew of her confidential EEO complaint. Although personnel may sometimes shift between the offices, AFIT and the legal office are separated by approximately five miles and a major highway. Despite this geographical separation, Ms. Stukey contends that personnel in the legal office knew of Ms. Stukey's EEO complaint. As evidence, Ms. Stukey points to Colonel Matlock's promotion party. Ms. Stukey claims that at Colonel Matlock's party, personnel from the legal department were discussing her confidential EEO complaint. Neither Colonel Matlock nor Ann Koch, a friend of Ms. Stukey's, could recall whether Ms. Stukey's EEO complaint was discussed at Colonel Matlock's party.

However, even if conversation did occur concerning Ms. Stukey's EEO complaint, an EEO investigator had inquired about the circumstances surrounding Ms. Stukey's interview. Although the investigator did not reveal Ms. Stukey's name, Ms. Stukey's interview was distinctive. Moreover, Ms. Stukey discussed her feelings regarding her interview experience with a number of people, including members of the selection committee. Thus, the Plaintiff has not made a showing that her supervisors in the legal office even knew of her EEO complaint, let alone knew of the complaint through impermissible means. Furthermore, Ms. Stukey never has demonstrated why her superiors in the legal office would retaliate against her for filing an EEO complaint against AFIT. Thus, Ms. Stukey has not established the requisite causal link that Ms. Stukey experienced at work because she filed an EEO complaint.

Out of an abundance of caution, we will now examine the individual instances of alleged retaliation. We conclude that Ms. Stukey has not shown by a preponderance of the evidence that the Defendants retaliated against her in any way. Ms. Stukey asserts that her vacation was changed to retaliate against her filing an EEO complaint. However, personnel in the legal office often had their vacation schedules changed, depending upon the demands of the office. Ms. Stukey also claims that the legal office took away her computer in retaliation. However, the evidence showed that Colonel Bexten took away Ms. Stukey's computer because she was not using it for official business purposes. The removal of the computer did not deny Ms. Stukey access to the computer system, but merely restricted her to the use of terminal in open areas in order to encourage her to use the computer exclusively for official business.

Ms. Stukey also claims that her boss, Robert Clayton, retaliated against her by engaging in physical threats and verbal abuse. It is very much disputed whether Mr. Clayton harassed Ms. Stukey. However, assuming that he did, no evidence exists that he harassed her because she filed an EEO complaint. On August 16, 1985, many of Mr. Clayton's private computer files were copied to Ms. Stukey's files and then deleted. Mr. Clayton, and later an independent investigator, concluded that Ms. Stukey may have deleted the files. Ms. Stukey vehemently denies having deleted the computer files. Whether or not Ms. Stukey deleted the computer files is irrelevant, Mr. Clayton believed that Ms. Stukey had deleted the files. His suspicion about Ms. Stukey undoubtedly did not generate a comfortable working relationship between Mr. Clayton and Ms. Stukey.

Ms. Stukey also claimed that Mr. Clayton retaliated against her by refusing to allow her time to process her grievance. However, Mr. Clayton testified that he had no objection to her processing her grievance so long as Ms. Stukey kept her scheduled legal assistance appointments. Mr. Clayton wrote two memos on the subject in September 1985 and stated that, "I am not opposed to Ms. Stukey having additional official time if it is reasonable based upon he facts and circumstances of her individual case.... It may be possible and certainly more reasonable to grant her additional official time if she requests it for hours when she is not or should not be scheduled to see legal assistance clients." Joint ex. V–3, at 19. In light of these memos and Mr. Clayton's testimony, we conclude that

Mr. Clayton did not refuse Ms. Stukey time off work to visit the EEO counselor.

Ms. Stukey finally contends that her office was changed in retaliation. Indisputably, Ms. Stukey got moved to a less desirable office. Nevertheless, her new office was fit for an attorney, and the move was part of an office-wide reorganization which was announced at a staff meeting prior to the move. Two paralegals moved into Ms. Stukey's old office.

### RELIEF

■ We must now determine what the appropriate relief is for the Plaintiff on her meritorious claim of sex discrimination. The Plaintiff asks for assorted injunctive relief. To reinstate Ms. Stukey would not be productive for either Ms. Stukey or the Air Force. Unfortunately, seven years of litigation have gone by since Ms. Stukey's non-selection. This litigation has helped to fester animosity on both sides. Therefore, we conclude that reinstatement is not proper.

■ We now examine the damages that Ms. Stukey has suffered. After leaving Wright–Patterson, Ms. Stukey started a private law practice. In her practice, Ms. Stukey earned $243,775.00. If Ms. Stukey would have received the position at AFIT, she would have earned $237,961.60 in wages.[5] Plus, she would have earned benefits equal to some percentage of her wages. Ms. Stukey did not earn these same benefits in private practice. The Defendants assert that 35.8% extra would have been earned, while the Plaintiff states that 40% should be used. As the Defendants have provided no reasons for their 35.8% figure, we opt for the Plaintiff's recommended percentage, as the Plaintiff gave its reasons for the 40% figure at trial. Forty percent of $237,961.60 is $95,184.64. Therefore, Ms. Stukey would have earned $333,146.24 in wages and benefits at AFIT, but only earned $243,775.00 in private prac-

tice. Thus, Ms. Stukey's damages are $89,371.24.

Ms. Stukey also asks for costs and reasonable attorney's fees. This Court will consider such a request if it is accompanied by appropriate authority and documentation.

### CONCLUSION

We conclude that the Defendants impermissibly used gender in not selecting the Plaintiff for a position at AFIT. However, the Plaintiff did not prove by a preponderance of the evidence that the Defendants retaliated against her for filing an EEO complaint.

Accordingly, judgment is granted to the Plaintiff in the amount of $89,371.24.

SO ORDERED.

---

5. Ms. Stukey also argues that she worked overtime in her law practice, but would not have worked over-time at Wright–Patterson. Ms. Stukey has presented no evidence to this Court to substantiate this claim. Therefore, we have disregarded over-time in calculating Ms. Stukey's damages.