**Bridget KEEGAN, Plaintiff,**

v.

**John DALTON, Secretary of the Navy, United States Department of Defense, Defendant.**

Civ. A. No. 3:94CV741.

United States District Court, E.D. Virginia, Richmond Division.

Sept. 21, 1995.

---

Sol Z. Rosen, Washington, DC, Richard Johan Conrod, Sr., Richard J. Conrod Sr., P.C., Virginia Beach, VA, for plaintiff.

Debra Jean Prillaman, Office Of The U.S. Attorney, Richmond, VA, for defendant.

## MEMORANDUM OPINION

SPENCER, District Judge.

This case is before the Court upon the plaintiff's Motion for Leave to File an Amended Complaint and the defendant's Motion to Dismiss or for Summary Judgment. For the reasons set forth below, the Court will GRANT summary judgment for the defendant. The Motion to Amend will be DENIED.

### I

Bridget Keegan has been an employee of the Department of the Navy ("the Department") since 1983. She holds bachelor's degrees in chemistry, biology and materials engineering, and a master's degree in environmental engineering. She has consistently received "fully successful" or "outstanding" performance reviews. At all times relevant to this case, Keegan was employed as a grade GS–12 environmental engineer at the Naval Underwater Systems Center in New London, Connecticut and Newport, Rhode Island ("NUSC").[1] NUSC performed research and development related to submarine warfare, including such areas as underwater systems, weapons, and countermeasures.

In 1988, Keegan decided to pursue a doctoral program in environmental science. She therefore applied to the Department for long-term training, a benefit that would have afforded her up to one year of intensive study and research programs, at non-governmental facilities in areas related to her work.

A civilian recipient of this benefit continues to receive a federal salary and also receives tuition and travel costs. In return for the subsidy, the employee must commit to work for the government for at least three years upon her return. Keegan contends that participation in this program would have enabled her to complete her doctoral studies and secure a promotion to a GS–13 level. She also claims that she initially accepted a position with the Department in the hope of securing long-term training.

Applications for long-term training were considered by NUSC's Long–Term Training Committee, chaired by William A. VonWinkle, then the facility's Associate Technical Director for Research and Technology. Seven other persons sat on the Committee, charged with selecting the best-qualified candidates for training. NUSC solicited long-term training applications on a general basis, with no limit on the number of applicants. Applicants were asked to disclose their career plans, academic and professional qualifications, and training objectives. They were also asked to submit the recommendation of a supervisor and to draft an Individual Development Plan. They were given no information about any fixed standards by which their applications would be considered. After reviewing a candidate's application, the Committee members would interview the candidate personally. They then discussed the merits of each applicant and reached a consensus as to their top choices. This list of applicants was provided to NUSC's Technical Director, who made the actual decision.

In 1988, NUSC had the wherewithal to place 18 employees in long-term training. Keegan, one of 30 candidates for these spots, asked the Deputy Department Head of the Facilities Department at NUSC, Joseph G. Navin, to recommend her for long-term training. Navin states that upon reading the first draft of Keegan's application, he felt it was poorly written and made no connection between NUSC's technical programs and her proposed course of study. He claims that he expended considerable time and effort re-

---

**1.** The facility is now called the Naval Undersea Warfare Center, Newport Division ("NUWC").

writing Keegan's application,[2] but that after consulting with his supervisor, he agreed to support Keegan.

Despite the favorable endorsement, the Committee recommended that Keegan not receive long-term training, and the Technical Director concurred. VonWinkle felt that Keegan had performed poorly during the interview[3] and that her curriculum plans were unclear. Indeed, at the time of her application, he recalls, she had yet to be accepted into a doctoral program at which she could take the courses she desired. Further, Keegan lacked an academic adviser for her Ph.D. and an endorsement from those NUSC departments that she maintained would be benefitted by her study.[4]

The Committee's lone female member during the years at issue, Mary H. Lee, recalls that Keegan did not seem ready to pursue the doctoral training she proposed, and that the Committee concluded that NUSC did not need a Ph.D in environmental sciences. According to Lee, the Committee preferred candidates who were already doing doctoral level course work in a field directly related to NUSC's mission, a field such as oceanic, mechanical, or electrical engineering. Keegan, by contrast, had yet to finish her master's degree.

In June 1988, the Committee's non-voting Technical Advisor, Walter Mey, advised Keegan of the decision:

> The committee did not feel that the program of study presented was particularly appropriate for someone who has made it

clear that they plan to eventually relocate to Code 30 or Code 60. If, in the future, you desire to pursue a curriculum where knowledges learned will benefit you and Code 30 or Code 60, please do not hesitate to reapply for long-term training.[5]

Of approximately thirty applicants in 1988, eight were women. Three women withdrew their applications during the process, and four others were among the eighteen that the Committee recommended for long-term training. Therefore, Keegan was the lone female not selected. Of the successful applicants, three women sought master's degrees and one doctoral training.

Keegan renewed her application in the Spring of 1989, by which time budgetary limitations had reduced the number of available spaces to twelve. Again, approximately thirty people applied, seven of them women. Keegan once more asked Navin for his recommendation. At this juncture, NUSC's Environmental Program was concerned primarily with eliminating hazardous waste within a ninety day time frame. Accordingly, Navin felt that Keegan's duties required program management skills, rather than an advanced environmental sciences degree. Additionally, Navin contends that Keegan's performance, while still "fully successful," had slipped from a higher rating.

After conferring with his superior again, Navin elected to forward her application to the Committee without an endorsement, choosing this avenue rather than recommending against the selection of one of his

---

2. Keegan disputes the amount of time Navin spent on her application, and contends that his contribution was limited to mentioning a number of courses that she and Navin agreed were important to NUSC.

3. So poorly, he claims, that he offered her a second interview and counseled her about how to improve her presentation. He recalls that she fared no better on her second interview. Keegan flatly denies ever meeting with Dr. VonWinkle about her interview, and also denies that she ever received a second interview.

4. During the EEO investigation, the investigating officer noted Dr. VonWinkle's belief that successful candidates were superior to Keegan in their ability to "(a) aggressively present a professional well-organized career plan and study program

assessing their qualifications, work achievements, and potential in a confident and knowledgeable manner; and (b) demonstrate initiative and a desire to improve their capability consistent with NUSC assignments and personal goals."

5. Keegan denies ever telling the Committee that she wished to transfer to either of these Codes, or departments, at NUSC. Instead, she claims to have told the Committee that her proposed course of study would enable her to accept increased responsibilities from each Code and that her hazardous materials management tasks were of basic importance to every part of NUSC. However, it is documented that she wrote to Mey in April 1988 that her "long-term goal is to work in either Code 33 or 60." Evidently, Mey erroneously recorded the first position as Code 30.

own. Making only one alteration on the form, changing the importance he assigned to Keegan's training from "priority I" to "priority III," Navin sent her application forth though official channels. NUSC's training office soon called Navin, however, seeking his assessment of whether the Facilities Department required advanced studies in the environmental sciences area. On April 11, 1989, Navin responded by memorandum, indicating that the Facilities Department did not need an employee with a doctorate in environmental science or environmental engineering.

Keegan's application was again rejected, although both Lee and VonWinkle indicate that the lack of a positive supervisory endorsement did not compel that result. Rather, says Lee, the Committee simply read Navin's memorandum as confirmation of its own continuing belief that the Facilities Department did not need a Ph.D in environmental science. As the Committee understood the situation, NUSC's environmental interests tended towards regulatory compliance rather than research. Moreover, VonWinkle remembers that the Committee found Keegan's proposed course of study lacked specificity (she had merely listed the available courses, rather than identifying an actual curriculum). Despite these perceptions, however, Keegan was merely notified that

> Of the twenty-nine candidates filing for Long–Term Training, twelve have been selected to participate in the academic year 1989–1990. It is with regret that I must apprise you of your non-selection . . . Your interest in furthering your education is noted, and the Command sincerely hopes that the non-selection does not deter you from re-applying in the future.

The Committee had recommended eighteen people for long-term training, four of them women. When VonWinkle was asked to rank-order the recommended candidates, three of his top twelve were women, and all three were approved for long-term training. Again, Keegan was the only woman not selected. Two women who received long-term training pursued master's degrees, one a Ph.D.

Keegan then filed an EEO complaint with the Department.[6] In it, she contended that:

> I have been denied my employer's financial assistance to obtain education and training necessary to qualify myself to fulfill responsibilities assigned by having my application rejected by the respondent when I met all applicable eligibility requirements and there was no bona fide reason to reject my application. A man who filed an equivalent application would have been accepted.

She did not request backpay or a promotion, only that she receive one year of long-term training, attorney fees and costs.

On January 7, 1994, the Department denied Keegan's complaint and issued a Right to Sue letter. On March 21, 1994, Keegan filed suit against the Secretary of the Navy ("the Secretary") in the United States District Court for the District of Columbia. On September 20, 1994, that court found that "the employment records relevant to [the challenged employment] practice are maintained and administered" in Dahlgren, Virginia, see 42 U.S.C. 2000e–5(f)(3), within the bounds of the Eastern District of Virginia, Richmond Division.[7] Accordingly, the case was transferred to this venue.

Keegan maintains that the Navy denied her application for long-term training solely because of her gender. She forwards a "glass-ceiling" argument, claiming that over 90% of employees holding doctorate degrees were male, and that the majority of promotions went to males as a result of allegedly gender-specific promotion lists. With the denial of long-term training, she contends, she has missed grade promotions and attendant salary increases, lost benefits, and has suffered mental anguish and emotional distress. She seeks declaratory and injunctive relief,

---

**6.** This is the only administrative complaint she has filed in this matter.

**7.** On May 5, 1991, Keegan assumed her current duties as an Environmental Engineer (GS–12) at the Naval Surface Warfare Center in Dahlgren. In September 1994, she took a leave of absence to complete her doctoral training at her own expense.

including promotion, long-term training benefits, back pay and monetary damages.

## II

Keegan first seeks leave to amend her complaint to clarify her allegations and demands. Apparently, poor drafting by her former attorney led the Secretary to believe that she was alleging both a discriminatory denial of long-term training benefits and a discriminatory denial of promotions. She now wishes to make clear that the only claim raised before this Court is the denial of long-term training. The *effect* of this, she contends, was to make her less eligible for promotions.[8]

■ The Court's discretion to deny leave to amend is constrained by the dictate of Federal Rule of Civil Procedure 15(a) that "leave shall be freely given when justice so requires," and by the general policy embraced by the Federal Rules favoring resolution of cases on their merits. *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.), *cert. dismissed*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980). A court may not "use its discretion either arbitrarily, or in a way that undermines the basic policy of the rule." *Id.* The Supreme Court has identified the general standard to be employed by federal courts:

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 279 (4th Cir.1987); *Ward Electronics Serv. v. First Commercial Bank,* 819 F.2d 496, 497 (4th Cir.1987); *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir.1986) ("leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment may be futile").

■ For reasons that will become clear as the Court addresses the merits of Keegan's case, the motion for leave to amend is pointless. The proposed amended complaint adds no new theories of liability, and no allegations of material fact. It is forwarded simply to resolve a disagreement about the scope of her claim. Because the Court is satisfied that both this controversy and the case as a whole can be resolved without the aid of this futile amendment, the Motion for Leave to Amend will be denied. *See Shanks v. Forsyth County Park Authority, Inc.,* 869 F.Supp. 1231, 1238 (M.D.N.C.1994); *Helsabeck v. United States,* 821 F.Supp. 404, 405 (E.D.N.C.1993).

## III

In support of his Motion to Dismiss, the Secretary forwards two arguments that favor disposing of part of this case on the pleadings. First, he contends that to the extent Keegan is alleging that she has been denied promotion or subjected to reprisals, her claims must be dismissed because she has failed to timely exhaust her administrative remedies and because such claims exceed the scope of her lone administrative complaint. Second, he maintains that Keegan's claim for compensatory damages and jury demand must be stricken, given that the alleged discriminatory conduct occurred in 1988–89,

---

**8.** In addition, Keegan no longer contends that she was denied a doctoral degree as a result of the alleged discrimination, but only that the Department's actions denied her the chance to work towards completion of her degree. Finally, she wishes to revise her prayer for relief to delete a request "that she be granted long-term training for the forthcoming academic year to enable her to complete her Ph.D studies" and replace it with

two requests: (1) "that she be reimbursed for backpay lost as a result of her talking an unpaid leave of absence to receive the education that long-term training would have otherwise afforded her," and (2) "that she be granted educational expenses incurred in the first year of her doctoral studies that the long-term training would have paid."

well before the passage of the Civil Rights Act of 1991.

### A

■ The function of a motion to dismiss is to test "the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1992), *cert. denied,* — U.S. ——, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993). Thus, this Court must accept the facts as alleged in the complaint, *Puerto Rico ex. rel. Quiros v. Alfred L. Snapp & Sons,* 632 F.2d 365, 367 (4th Cir.1980), *aff'd,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), and make all reasonable inferences in favor of the non-moving party. *Johnson v. Mueller,* 415 F.2d 354 (4th Cir.1969); *MacKethan v. Peat, Marwick, Mitchell & Co.,* 439 F.Supp. 1090 (E.D.Va.1977). The plaintiff need only make "'a short and plain statement' of the claim showing that the pleader is entitled to relief." *Republican Party of North Carolina,* 980 F.2d at 952 (quoting Fed.R.Civ.P. 8(a)(2)). This Court will not dismiss any complaint unless it appears beyond a doubt that the plaintiff could not recover under any set of facts which could be proven. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Doby v. Safeway Stores, Inc.,* 523 F.Supp. 1162 (E.D.Va.1981); *Austin v. Reynolds Metals Co.,* 327 F.Supp. 1145 (E.D.Va.1970).

### B

■ The Secretary first maintains that to the extent Keegan alleges that she has been denied promotion[9] or subjected to reprisals, her claims must be dismissed because she has failed to exhaust her administrative remedies. Administrative exhaustion, of course, is a precondition to suit under Title VII of the Civil Rights Act of 1964. *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). As noted above, Keegan's formal administrative complaint concerned one issue, the denial of long-term training.

■ In support of her Motion to Amend, Keegan professes to be raising only the long-term training claim in this Court. However, in response to the Secretary's Motion to Dismiss, she takes a contradictory stance, claiming that her superiors attempted to make her duties more difficult for her in retaliation for commencing her complaint. As she made more clear in her deposition, Keegan avers that in the Spring of 1989, Navin picked at her written correspondence and her immediate supervisor threatened to revamp her job description. She further contends that from September or October 1989 until May 1991, Navin subjected her to "strict and harsh review on an ongoing, daily basis." Dep. of Bridget Keegan at 69. She elaborated that "any—even a correspondence—everything would be returned, any documentation worked on, petty fault finding to the maximum." *Id.*[10] Finally, she claims that she was forced to ride a commuter van between the Newport and New London Commands, rather than driving her car as a time-saving measure.

Keegan raised some of these charges during her pre-complaint counseling. Nevertheless, she neglected to mention any retaliation in the narrative portion of her formal complaint and did not mark "reprisal" as a part of her grounds for a discrimination complaint. Further, when the Department identified only one claim in Keegan's EEO complaint, it afforded her seven days to correct any misconception it might have had about the substance of her grievance. She failed to respond. Finally, when she did discuss retaliation with NUSC's Deputy EEO Officer soon after she filed her formal complaint, she was told "If you feel you're being retaliated against, you know, you may want to file another complaint." *Id.* at 79. She did not. The conclusion is clear. Keegan did not include any claim of reprisal in her formal

---

9. Because Keegan avers that promotion is not the gravamen of her discrimination claim, the Court will not address that issue, save for dismissing her Complaint to the extent it could be read to raise such a claim.

10. However, she also admitted that she was generally not the signatory on correspondence.

complaint, nor were such charges investigated. Therefore, she has failed to exhaust her administrative remedies on this claim. *Stukey v. United States Air Force,* 809 F.Supp. 536, 544 (S.D.Ohio 1992).

■ Keegan urges this Court to find that her Complaint in this case is sufficient to raise a claim of retaliation, and that the Secretary was on notice that she had suffered retaliatory supervision after she commenced her grievance. The first of these arguments is patently false, for nothing in Keegan's Complaint constitutes a short, plain statement of the facts sufficient to advise the Secretary that she was suing for retaliation. *See* Fed.R.Civ.P. 8(a). Her second response is irrelevant. The scope of a civil action under Title VII is drawn by the scope of the administrative investigation that can reasonably be expected to follow the formal charge of discrimination. *Nicol v. Imagematrix, Inc.,* 767 F.Supp. 744, 752 (E.D.Va.1991). Although Keegan raised some of the issues for a claim of retaliation as she began the process leading to a formal EEO complaint, she dropped that basis of her grievance before her complaint was filed. During the extended period of time in which the Navy investigated Keegan's allegations, retaliation was never an issue. Consequently, she cannot be heard to raise the claim here. *Cf. Travis v. Frank,* 804 F.Supp. 1160, 1164–65 (E.D.Mo.1992) (where plaintiff failed to check "reprisal" box on formal complaint, but EEOC actually investigated her retaliation charges, court found plaintiff had exhausted her administrative remedies).

Lastly, Keegan contends that a retaliation claim is permitted by *Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir.1992), in which the Fourth Circuit held that retaliation claims arising out of an earlier EEO charge are exempt from the administrative exhaustion requirement. The reasons for rejecting this contention are legion. First, as the Secretary notes, Keegan cannot avail herself of this exception when she could have raised the reprisal charge in the original administrative complaint:

> Retaliatory conduct occurring prior to the filing of the EEOC charges is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint.

*Ang v. Procter & Gamble Co.,* 932 F.2d 540, 546–47 (6th Cir.1991). Further, because Keegan's Complaint before this Court fails to allege retaliation, there is no such claim to which the *Nealon* rule could apply.

■ Finally, even if the Court indulged Keegan's attempt to invent a retaliation claim, her charge is legally inadequate. Section 704(a) of Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a); *see Crowley v. Prince George's County,* 890 F.2d 683, 687 (4th Cir.1989). In order to establish a prima facie case of retaliation under Title VII, Keegan must prove that: (1) she engaged in a protected activity; (2) the Department took adverse employment action against her; and (3) there existed a causal connection between the protected activity and the adverse action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991). Here, however, Keegan has at best alleged that her supervisors attempted to erect minor hindrances to the timely accomplishment of her tasks. Nothing in her allegations might constitute "adverse employment action." *See Ward v. Johns Hopkins University,* 861 F.Supp. 367, 377 (D.Md.1994) (defining "adverse employment action" as "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating.") Asserted at this late stage of the case, Keegan's reprisal claim smacks of a desperate attempt to avoid summary judgment. It will be rebuffed.

### C

■ The Secretary next argues that both Keegan's claim for compensatory damages and her jury demand must be stricken, given that the alleged discriminatory conduct occurred in 1988–89, well before the passage of the Civil Rights Act of 1991. The Supreme Court held that those amendments do not apply retroactively to cases arising before the enactment. *Landgraf v. USI Film Prods.,* —— U.S. ——, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994). Conduct occurring

before November 21, 1991, the effective date of the Act, cannot be remedied with compensatory damages, nor can it be tried in front of a jury. *Spicer v. Virginia,* 818 F.Supp. 917 (E.D.Va.1993). Because the conduct challenged in this case clearly arose before that date, Keegan can get neither the relief nor the audience she seeks.

■ Keegan tries an end-run around *Landgraf,* contending that she suffered a "continuing injury" after the effective date of the Act, because she was forced to wait until January 1994 for the Navy to resolve her complaint. This delay, she maintains, is an exceptional circumstance constituting a continuous injury. However, as the Secretary points out, Keegan could easily have mitigated any such injury by seeking a right to sue letter within 180 days of filing her complaint, and proceeding directly to court. 42 U.S.C. § 2000e–5(f). Further, Keegan ignores the elementary fact that though the administrative investigation may have been a lengthy process, this does not constitute another *violation* of Title VII. And it is a violation that matters. *See Knight v. Columbus,* 19 F.3d 579, 580 (11th Cir.) (continuing effect of past, unchallenged violation of Title VII on pay and benefits is not actionable), *cert. denied,* —— U.S. ——, 115 S.Ct. 318, 130 L.Ed.2d 280 (1994). More importantly, it must be a violation occurring after the effective date of the Civil Rights Act of 1991. *See Woodard v. Lehman,* 717 F.2d 909, 914–916 (4th Cir.1983) (mere allegation of continuing discrimination without any identification of a discriminatory event within the statute of limitations period is insufficient to prove a continuing violation). As she lacks any such evidence, Keegan's claim for compensatory damages and a jury trial will be stricken.

It is now clear that Keegan's discrimination complaint involves solely the denial of long-term training. It is to the merits of that complaint, and to what will prove to be the Secretary's dispositive motion, that the Court now turns.

## IV

■ Under Rule 56(c), a motion for summary judgment may be granted "only if the pleadings, depositions, interrogatory answers, admissions, and affidavits show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Magill v. Gulf & W. Indus., Inc.,* 736 F.2d 976, 979 (4th Cir.1984) (quoting Fed.R.Civ.P. 56(c)); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992). "Where ... the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

■ The party moving for summary judgment always bears the initial burden of informing the Court of the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Any inferences "drawn from the underlying facts contained in the materials before the trial court must be viewed in the light most favorable to the party opposing the motion." *Helm v. Western Md. Ry.,* 838 F.2d 729, 734 (4th Cir.1988). Only after the movant's burden is met, and a properly supported motion is before the Court, must the party opposing the motion "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)); *accord Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

## A

■ Section 703(a)(1) of Title VII prohibits any covered employer from "discriminat[ing] against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individuals' ... sex." 42 U.S.C. § 2000e–2(a). Under the

burden–shifting scheme of *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff claiming to be the victim of employment discrimination, but who lacks direct evidence of such disparate treatment, must first establish a presumption or prima facie case of discrimination. *See, e.g., St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Tailored to the context and procedural posture of this case, the prima facie case requires a genuine issue of material fact that (1) Keegan is a member of a class protected by Title VII; (2) she was entitled to the desired benefit; (3) the Department denied her this benefit; and (4) unprotected employees were granted the benefit. *Moore v. Norfolk & W. Ry. Co.,* 731 F.Supp. 1015, 1019 (D.Kan.1990). Unable to satisfy the second of these elements, Keegan cannot overcome the Secretary's motion for summary judgment.

The Secretary has come forth with ample evidence that Keegan did not qualify for long-term training. She failed to make persuasive presentations of her curriculum, she failed to enroll in a doctoral program, and the degree she hoped to pursue was not one of use to NUSC. Keegan responds that she was entitled to long-term training simply because, like all NUSC employees, she was entitled to apply. In fact, because the only objective qualifications were employment at NUSC, the EEO investigator determined that Keegan had satisfied her prima facie case. The Court disagrees. Though one may *apply* to medical school, for example, it does not follow that one has a right to be accepted. Keegan has offered no evidence undermining Lee and VonWinkle's statements about the selection criteria; she merely contends that these are after-the-fact excuses. But even if she is correct, that alone does not establish her qualification for long-term training. Nor does her own braggadocio that she held "superior qualifications." She has failed to establish a prima facie case of discrimination.

### B

Even assuming *arguendo* that Keegan has produced a prima facie case, the Secretary has unquestionably carried his burden of stating a legitimate, nondiscriminatory reasons for rejecting her application for long-term training. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *Green,* 411 U.S. at 802, 93 S.Ct. at 1824. Hence, the Secretary has removed the presumption of discrimination and may revert to silence. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2748. Keegan therefore bears the burden of raising a genuine issue of material fact that the Secretary's stated reasons are but a pretext for gender bias, a burden satisfied only by sufficient evidence "*both* that the [Secretary's] reason was false, *and* that discrimination was the real reason." *Id.* at ——, 113 S.Ct. at 2752 (emphasis in original).

The Secretary's evidence supporting the long-term training decisions is strong. However, Keegan attempts to discredit his explanations, contending that because NUSC did not announce objective qualifications to all potential applicants, any criteria upon which the Committee actually relied are inherently suspect. Indeed, the initial EEO complaint investigator noted that the application process was subjective. *See Stender v. Lucky Stores, Inc.,* 803 F.Supp. 259, 319 (N.D.Cal.1992) ("subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized"). But it is well established that the use of subjective criteria alone is not evidence of pretext, especially where the employer is rating professional and managerial employees. *Stone v. Galaxy Carpet Mills, Inc.,* 841 F.Supp. 1181, 1187 (N.D.Ga.1993) (citing cases). Keegan must still convince the Court that she has evidence of pretext.

Keegan posits that Lee and VonWinkle have articulated contradictory explanations for rejecting her applications. For example, she notes that Lee cited the relevancy of the proposed training to NUSC's mission and the candidate's demonstrated ability to succeed as factors important to the decision, and declared that while supervisory endorsements are important, they are not controlling. This, Keegan says, contradicts Von-

Winkle's statement that the interview was the most important part of the selection process. She also points out that Lee disagrees with Technical Advisor Mey's assessment that Keegan's first application was rejected because it "was not particularly appropriate for someone who ... plan[ned] to eventually relocate to Code 30 or Code 60."

However, it is unnecessary to delve into the minutiae of this argument and follow along as Keegan compares the statements of one person with those of another. Keegan isolates the Committee members' comments from the context they describe—the overall selection process. Viewed as a whole, there is no contradiction; both Lee and VonWinkle indicate that the application and the interviews, factors of which Keegan had advance notice, were important to the process, and that supervising endorsements were not controlling. And even if the Court reads conflict into these statements and presumes that they are manufactured excuses, Keegan fares no better. "Showing that the employer dissembled" is not necessarily the same as showing "pretext *for discrimination.*" *Holder v. City of Raleigh,* 867 F.2d 823, 827 (4th Cir.1989) (quoting *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)). Keegan has still failed to produce evidence enabling a reasonable fact finder to conclude "that discrimination was the real reason." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2752.

Similarly, Keegan strives to create material factual disputes where there are none, denying that Lee attended her interviews, disputing VonWinkle's statement that he counselled her about her interview, and rejecting Navin's recollection that he rewrote her first application. But these "disputes" are mere smokescreens. Whether Lee actually attended the interviews is irrelevant—it is undisputed that Lee served as a voting member on the Committee and voted on Keegan's application. Therefore, while her recollection of the process is important, whether she attended the interview is not. Similarly, whether Keegan had two chances to present her argument for selection or just one, or whether Navin wrote the bulk of her

application or just a fraction of it, has no bearing upon the Committee's rationale for rejecting her. Given a clear pool of facts, it is not enough to merely ripple the waters and disturb the image reflected. Keegan has an affirmative obligation to produce evidence suggesting that she was discriminated against because she was a woman. *See Autry v. North Carolina Dept. of Human Resources,* 820 F.2d 1384, 1386 (4th Cir.1987) (plaintiff must "prove that she was not promoted because of her race, not that she was a member of the black race and was not promoted").

■ Keegan cleaves to the belief that any explanations relied upon by the Secretary that fail to track the precise language used by the Department six years ago are suspect excuses and that *therefore* she has been the victim of gender discrimination. But employers are not obligated to provide detailed justifications for employment decisions, especially when the singular reason given to the employee is not inconsistent with later, more developed explanations. *Galaxy Carpet Mills,* 841 F.Supp. at 1187.

More importantly, whatever the resolution of her few factual disputes, one point remains unchallenged: the Committee selected women to receive long-term training, including some who wished to pursue doctoral degrees. None of Keegan's "beliefs" about the selection process speaks so loudly to the issue of pretext as the fact that women were selected for advance degree training under a system she claims was gender biased. *Cf. Proud v. Stone,* 945 F.2d 796, 796 (4th Cir.1991) (strong inference that discrimination was not determining factor in discharge when same individual both hired and fired plaintiff). She has failed, deplorably so, to raise a genuine issue of material fact as to the Department's motivation for not selecting her for long-term training. As a result, summary judgment is appropriate.

## V

To the case brought before the Court this day, it is enough to say that the plaintiff's claims fail entirely, and that the case will be dismissed. To the genre of cases to which it belongs, however, there is something more.

This case is yet another entrant in a tiresome parade of meritless discrimination cases. Again and again, the Court's resources are sapped by such matters, instigated by implacable parties and prosecuted with questionable judgment by their counsel. It is high time for this to stop. The Court entreats the legal community to pause and reflect, during their prefiling inquiry and continually as they nurse the case to maturity, whether they can identify any tenable basis for a claim of discrimination other than their client's skin color, age, religion, or gender. Without sufficient evidence of discrimination, that is, an adverse employment decision made *because of* a protected characteristic (and not simply one that concerns a person exhibiting a protected characteristic), a case under Title VII must fail.

Personality conflicts are a fact of life, occurring in the work-place with the frequency of overly-demanding supervisors and crushed employee expectations. And yes, discrimination is also alive and well in America today. But one will not unearth invidious distinctions lurking beneath every act of discipline or every denial of advancement. Any attempt to argue otherwise trivializes the laws enacted to eradicate the bigotry that still blocks the path to individual achievement and inhibits our collective advancement.

It also fosters a culture of victims. This Court does not have the power to prevent the rain from falling into anyone's life, and is not about to intercede in every work-place squabble. Where, as here, the law offers no remedy, the responsibility for recovering from the occasional affronts of office life falls at the feet of the complainant. Thus, a person who clings steadfastly to the belief that she has been unjustly wronged, when all the evidence suggests otherwise, risks more than a judicial defeat. She also imperils her own ability to rise above the normal setbacks of life and renders herself ill-prepared to face the next inevitable pitfall. And this self-inflicted wound is far more damaging.

To those souls who still labor under the heavy hand of illegal workplace discrimination, the doors of this Court will remain ever open. The pretenders, though, must learn to wrest control of their own lives from deleterious circumstances without seeking recourse from the courts.